No. 23-2193

# IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

STEVEN CHECCHIA, INDIVIDUALLY AND AS A
REPRESENTATIVE OF THE CLASS,
*Plaintiff-Appellee,*

v.

SOLO FUNDS, INC.
*Defendant-Appellant.*

On Appeal from an Order and Memorandum Opinion Dated June 7, 2023
Denying, SoLo Fund, Inc.'s Motion to Compel Arbitration
in the United States District Court for the
Eastern District of Pennsylvania,
No. 2:23-cv-00444

## OPENING BRIEF OF APPELLANT SOLO FUNDS, INC. AND APPENDIX VOLUME I OF II (JA 1- JA 27)

Joseph A. Apatov
McGlinchey Stafford
101 NE 3rd Avenue, Suite 1810
Fort Lauderdale, Florida 33301
(954) 356-2516
(954) 252-3808 (fax)
japatov@mcglinchey.com
Admitted *pro hac*

Andrew K. Stutzman
Christopher A. Reese
Stradley Ronon Stevens & Young, LLP
2005 Market St., Suite 2600
Philadelphia, PA 19103
(215) 564-8000
(215) 564-8120 (fax)
astutzman@stradley.com
creese@stradley.com

*Counsel for SoLo, Funds, Inc., Defendant-Appellant*

## **CORPORATE DISCLOSURE STATEMENT AND STATEMENT OF FINANCIAL INTEREST**

Pursuant to Federal Rule of Appellate Procedure Rule 26.1 and 3d Cir. L.A.R. 26.1 (2011), SoLo Funds, Inc. makes the following disclosure:

1) For non-governmental corporate parties please list all parent corporations:

**None**

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

**None**

3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

**None**

4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

**Not Applicable.**

*S/* **Joseph A. Apatov**
*Counsel for SoLo Funds, Inc.*

Dated: 12/6/2023

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENT** ...................................................... ii

**TABLE OF CONTENTS** .................................................................................... iii

**TABLE OF AUTHORITIES** ............................................................................. vi

**JURISDICTIONAL STATEMENT** .....................................................................1

    **A.** **The District Court's Subject-Matter Jurisdiction.** ..........................1

    **B.** **Basis for the Court of Appeals' Jurisdiction.** ...................................1

**INTRODUCTION** ...............................................................................................2

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW** ......................3

**STATEMENT OF RELATED CASES AND PROCEEDINGS** ........................4

**STATEMENT OF THE CASE** ...........................................................................4

    **A.** **Undisputed Statement of Facts** .........................................................4

        **1.** **SoLo's Business** ........................................................................4

        **2.** **Checchia's Creation of a SoLo Account** ................................5

        **3.** **The Arbitration Agreement** ..................................................14

        **4.** **Checchia Took out 19 Loans on the SoLo Platform** ...........14

    **B.** **Procedural History** .............................................................................15

**STANDARD OF REVIEW** ...............................................................................17

**SUMMARY OF THE ARGUMENT** .................................................................18

**ARGUMENT** .....................................................................................................22

    **A.** **A Binding Agreement to Arbitrate Exists Between the Parties Based Upon Checchia Clicking "I Agree to SoLo's Terms and Conditions."**...............................................................22

1.    **Traditional Contract Principles Require Mutual Manifestation of Intent to be Bound.** .....................................22

2.    **Internet-Based Agreements are Governed by the Same Principles as Traditional Contracts.** ...........................26

3.  **Courts Developed Shorthand Terms "Clickwrap" and "Browsewrap"  to describe Commonly Encountered Fact Patterns** ..................................................................27

    a.    *The District Court Erroneously Relied Upon* Berman *which Involves Materially Different Facts.* ......33

5.    **The Final Page Contains Design Elements that Make Any Reasonably Prudent User Aware of the Terms and the Import of the Act of Clicking the "I agree" Checkbox.** ..................................................................38

    a.    *The Hyperlink was in Close Proximity to the "I Agree to SoLo's Terms & Conditions" Checkbox and this Consideration is of Minimal Significance in this Case.* ..................................................40

    b.    *The Hyperlink to the Terms Were Differentiated From the Surrounding Text and Clearly Identified as a Hyperlink.* ..................................................44

    c.    *The Use of Terms of Service in the Hyperlink does not defeat Checchia's assent to the Terms.* ....................51

B.    **An Agreement to Arbitrate Exists Between the Parties Based Upon the Full Context of the Transaction and Checchia and SoLo's Relationship** .....................................54

C.    **Checchia Failed to Contest Any Evidence Related to Assent** .......57

D.    **Subsequent Changes in Pennsylvania Law are Inapplicable on Appeal.** ..................................................................60

E.    **The District Court Erred by Not Permitting Discovery and a Trial** ..................................................................63

**CONCLUSION** ..................................................................65

**COMBINED CERTIFICATIONS OF COUNSEL** ............................................67

**CERTIFICATE OF SERVICE** ...........................................................................68

# TABLE OF AUTHORITIES

**Cases**

*Air Prod. & Chems. v. Hartford Acc. & Indem. Co.*, 25 F.3d 177 (3d Cir. 1994) ..62

*Allstate Ins. Co. v. Drumheller*, 115 Fed. Appx. 528 (3d Cir. 2004) .....................63

*B.D. v. Blizzard Entertainment, Inc.*, 76 Cal. App. 5th 931 (2022)................. 55, 56

*Baker v. Outboard Marine Corp.*, 595 F.2d 176 (3d Cir. 1979) ...................... 62, 63

*Be In, Inc. v. Google Inc.*, No. 12-cv-03373, 2013 WL 5568706 (N.D. Cal. Oct. 19, 2013).......................................................................................................28

*Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225 (4th Cir. 2019).......... 63, 64

*Berman v. Freedom Financial Network, LLC*, 30 F.4th 849 (9th Cir. 2022).. passim

*Brennan v. CIGNA Corp.*, 282 Fed. App. 132 (3d Cir. 2008)......................... 23, 24

*Brooks v. IT Works Marketing, Inc.*, No. 1:21-cv-1341, 2022 WL 2079747 (E.D. Cal. Jun. 9, 2022) ................................................................... 40, 41, 42

*Cat Internet Services, Inc. v. Providence Washington Ins. Co.*, 333 F.3d 138 (3d Cir. 2003).......................................................................................17

*Chilutti v. Uber Technologies, Inc.*, 300 A.3d 430 (Pa. 2023) ............. 60, 61, 62, 63

*Commonwealth v. Gamby*, 283 A.3d 298 (Pa. 2022) ............................................51

*Dicent v. Kaplan University*, 758 Fed. Appx. 311 (3d Cir. 2019).................... 22, 26

*Egan v. Live Nation Worldwide, Inc.*, 764 F. App'x 204 (3d Cir. 2019).......... 63, 64

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995)..............................26

*Forestal Guarani SA v. Daros Intern., Inc.*, 613 F.3d 395 (3d Cir. 2010) .............62

*Guidotti v. Legal Helpers Debt Resol., LLC*, 716 F.3d 764 (3d Cir. 2013) ............17

*Hansen v. LMB Mortgage Services, Inc.*, 1 F. 4th 667 (9th Cir. 2021)..................63

*HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308 (W.D. Pa. 2020)........27

*HM DG, Inc. v. Amini*, 219 Cal. App. 4th 1100 (2013)...........................................22

*Huber v. Taylor*, 469 F.3d 67 (3d Cir 2006)...........................................................22

*James v. Global TelLink Corp.*, 852 F.3d 262 (3d Cir. 2017)................... 17, 27, 28

*Jin v. Parsons Corp.,* 966 F.3d 821 (D.C. Cir. 2020)..............................................63

*Keating v. Pittston City*, 643 Fed. Appx. 219 (3d Cir. 2016) ......................... 58, 59

*Kindred Nursing Centers Ltd. P'ship v. Clark*, 581 U.S. 246 (2017) ...................62

*Lee v. Ticketmaster LLC*, 817 F. App'x 383 (9th Cir. 2020)..................................27

*Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855 (2016)...........................22

*Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.,* 89 Cal. App. 4th 1042 (2001) ...................................................................................24

*McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657 (3d Cir. 1980) ..................... 61, 62

*Meyer v. Uber Tech*, 868 F3d 66 (2d Cir. 2017) ........................................... passim

*Morales v. Sun Constructors, Inc.*, 541 F. 3d 218 (3d Cir. 2008) ........ 22, 23, 24, 25

*MZM Construction Co., Inc. v. New Jersey Building Laborers Statewide Benefit Funds*, 974 F.3d 386 (3d Cir. 2020)....................................................................24

*Neb. Mach. Co. v. Cargotec Sols., LLC*, 762 F.3d 737 (8th Cir. 2014) ........... 63, 64

*Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171 (9th Cir. 2014) ................... passim

*Nicosia v. Amazon.com, Inc.*, 834 F.3d 220 (2d Cir. 2016)....................................26

*Oberstein v. Live Nation Entertainment, Inc.*, 60 F.4th 505 (9th Cir. 2023).... 44, 45

*Oberstein v. Live Nation Entertainment, Inc.*, No. 20-cv-3888, 2021 WL 4772885

   (C.D. Cal. Sep. 20, 2021) ........................................................................... 45, 46

*Pac. Employers Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417 (3d Cir.

   2012)........................................................................................................ 61, 62

*Pei Chuang v. OD Expense LLC*, 742 Fed. Appx. 670 (3d Cir. 2018)....................17

*Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172 (3d Cir. 2010) ...............................17

*Register.com, Inc. v. Veiro, Inc.*, 356 F.3d 393 (2d Cir. 2004) ..............................26

*Selden v. Airbnb*, No. 16-cv-00933, 2016 WL 6476934 (D.D.C. Nov. 1, 2016).. 55,

   56

*Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 477 (2021) ................. 25, 54, 55

*Sheet Metal Workers Int'l. Ass'n Local Union No. 27, AFL-CIO v. E.P. Donnelly,*

   *Inc.*, 673 F.Supp.2d 313 (D.N.J. 2009) ...............................................................24

*Shuker v. Smith & Nephew, PLC*, 885 F.3d 760 (3d Cir. 2018).............................61

*Simeone v. Simeone*, 581 A.2d 162 (Pa. 1990).......................................... 23, 24, 54

*Van Tassell v. United Mktg. Grp., LLC*, 795 F.Supp.2d 770 (N.D. Ill. 2011) ........28

*White v. Ring*, No. 22-cv-6909, 2023 WL 1097554 (C.D. Cal. Jan. 25, 2023) 51, 52

*White v. Sunoco, Inc.*, 870 F.3d 257 (3d Cir. 2017) ..................................................1

*Williams v. BASF Catalysts LLC*, 765 F.3d 306 (3d Cir. 2014) ..............................61

*Wilson v. Huuuge, Inc.*, 944 F.3d 1212 (9th Cir. 2019)................................... 26, 27

*Zaltz v. JDate,*, 952 F.Supp.2d 439 (E.D.N.Y. 2013)....................................... 42, 43

## Statutes

13 Pa.C.S.A. § 1201(10) ........................................................................39

28 U.S.C. § 1291 .....................................................................................1

28 U.S.C. § 1332(d) ................................................................................1

28 U.S.C. § 1441 .....................................................................................1

28 U.S.C. § 1446 .....................................................................................1

28 U.S.C. § 1453 .....................................................................................1

9 U.S.C. § 4 ..........................................................................................4, 63

9 U.S.C. § 16(a)(1)(B) ............................................................................1

## Other Authorities

Richard A. Lord, *Williston on Contracts* § 4:19 (4th ed. 2008) ..............................23

# JURISDICTIONAL STATEMENT

## A.    <u>The District Court's Subject-Matter Jurisdiction.</u>

The District Court has subject-matter jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §1332(d), and the federal removal statutes, 28 U.S.C. §§ 1441, 1446, and 1453.

This putative class action satisfies all the jurisdictional requirements under CAFA, 28 U.S.C. § 1332(d)(2), (d)(5), (d)(6), and § 1453(b), because: (1) the proposed class consists of 100 or more members; (2) the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs; and (3) at least one member of the proposed plaintiff class is a citizen of a different state from any defendant. *See* Dkt. 1 (Notice of Removal).

SoLo's removal of the case was timely under 28 U.S.C. § 1446(b): its notice of removal was filed on February 5, 2023, within 30 days of the January 4, 2023 service date. *Id*.

## B.    <u>Basis for the Court of Appeals' Jurisdiction.</u>

This is an appeal from a final judgment. 28 U.S.C. § 1291. Appellate jurisdiction also exists under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 16(a)(1)(B), which concerns appeals from an order denying a motion to compel arbitration. *See White v. Sunoco, Inc.*, 870 F.3d 257, 262 (3d Cir. 2017).

This appeal is timely because the District Court order denying SoLo's Motion to Compel Arbitration was signed on June 7, 2023 and SoLo's notice of appeal was filed on July 5, 2023. JA[1] 1-27.

## INTRODUCTION

This case presents a *res nova* issue in this Circuit concerning the enforceability of arbitration agreements in contracts entered into via smartphones. In addition, this case highlights a significant limitation in existing case law concerning the interpretation of Internet-based agreements that are typically categorized as either 'clickwrap' or 'browsewrap,' with Courts routinely enforcing the former but not the latter. Many variations exist that do not neatly fit either category, as is the case here, but the principles relevant to the unique factual circumstances of 'browsewrap' and 'clickwrap' nonetheless drove the District Court's analysis. *See* JA 15-22 (Opinion).

The District Court's decision recognized that not all Internet agreements are clickwrap or browsewrap and concluded that the agreement here does not fit into either category, but nonetheless analyzed the agreement under browsewrap criteria in finding that Checchia did not agree to SoLo's Terms & Conditions (the "Terms") containing the arbitration agreement and class action waiver despite Checchia checking a box next to the words "I agree to SoLo's Terms & Conditions" which was presented on the same screen as the hyperlink to those Terms. JA 22.

_____

[1] "JA" is the abbreviation for Joint Appendix.

The District Court also did not take into account the ongoing relationship between Checchia and SoLo's in its analysis (*see* JA 15-24) although other courts have recognized the significance of a forward-looking relationship when considering the enforceability of Internet agreements and whether adequate notice exists. This is due to differing expectations between fleeting visitors and those establishing ongoing relationships, with the latter having a heightened expectation that an agreement governs the ongoing relationship.

This Circuit's decisions on Internet-based agreements is sparse, and the Circuit has not yet decided a case involving formation of a contract entered into through a mobile application, much less one that is neither purely clickwrap or browsewrap involving parties entering into an ongoing relationship related to financial products.

A ruling in this case will have an impact not only in this Circuit, but also nationwide because online agreements as well as those entered into on smartphones are increasingly commonplace and often (as here) do not fit neatly into the clickwrap/browsewrap binary. This case will permit this Court to articulate the proper standard to analyze and adjudicate such agreements.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

(1) Whether the District Court erred in holding that the arbitration clause was unenforceable by:

(a) finding that Checchia did not assent to the contractual terms, including the arbitration clause, based upon the design of the application;

(b) not considering the nature of the ongoing relationship between Checchia and SoLo; and

(c) not considering the failure by Checchia to rebut SoLo's evidence in support of the Motion to Compel Arbitration.

*See* Dkt. 8 at 14-25 (Motion); Dkt. 13 at 4-6 (Reply); JA 15-22 (Opinion).

(2) Whether the District Court erred by not permitting discovery and a trial under 9 U.S.C. § 4 on the issue of whether the parties entered into an agreement to arbitrate. Dkt. 29 at 31:15-32:8, 51:1-51:16 (Transcript).

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not been before this court previously and SoLo is unaware of any other case or proceeding that is in any way related, completed, pending, or about to be presented before this court or any other court or agency, state or federal.

## STATEMENT OF THE CASE

**A.     Undisputed Statement of Facts**

**1.     SoLo's Business**

SoLo provides an online platform ("SoLo's Platform") connecting those seeking to borrow money with third-parties offering to lend money. JA 42 (Muñoz

4

Dec. ¶ 3). The platform is accessible online at http://www.solofunds.com and via SoLo's mobile application (the "Mobile App"). *Id.*

### 2.    Checchia's Creation of a SoLo Account

Checchia signed up for his account through SoLo's Mobile App. *Id.* at ¶ 7. Doing this required him to navigate a series of screens that mandated he provide various pieces of personal information, including his name, date of birth, e-mail address, physical address, social security number, and telephone number. *Id.* at ¶¶ 9-10. All of this personal information, besides Checchia's telephone number, was provided on the final page of the process (the "Final Page"). *Id.* at ¶ 10.

The following are two screenshots of the Final Page as it was seen by Checchia. *Id.* at ¶ 11, JA 28-29 (Final Page) (yellow box added). These screenshots encompass a single page on the Mobile App, and Checchia scrolled through the first portion to reach the content of the second screenshot. JA 43 (Muñoz Dec. ¶ 10).

While Checchia scrolled through the Final Page, a static header also persisted, with "Welcome to SoLo!" in dark font, and "Get help" in blue-green font. JA 28-29 (Final Page). Other than this heading and an orange line dividing the heading from the remainder of the text, there are no design elements on the Final Page, and the text is almost entirely achromatic. *Id.*

Note that there is some overlap between the two screenshots (*i.e.* the box for entering a user's social security and the first two numbered paragraphs of text that

follows appears on both screenshots). *Id*. This is a consequence of the entire Final

Page occupying less than two full screens, thereby requiring some portions of the

scrollable page to be duplicated when capturing the screenshots. *See id.* For ease of

review, a yellow box has been added to this demonstrative exhibit to highlight where

the screenshots overlap.



*Id.* (yellow box added).



*Id*. (yellow box added).

After the boxes in which Checchia entered his personal information, (beginning with "First Name" and "Last Name" and ending with "Social Security Number") there are fourteen lines of text in dark font containing various affirmative statements such as "I am a U.S. citizen or other U.S. person." *Id*.



*Id*. (blue box added).

After scrolling past this text, six hyperlinks were displayed in a group. *Id.*; JA 43 (Muñoz Dec. ¶ 10). Each hyperlink is (i) in a font that is bold, (ii) blue-green, (iii) larger in size than the preceding fourteen lines, (iv) with greater spacing between lines, and (v) that consists of two to four words, with the first letter of each word (other than 'of') capitalized. JA 28-29 (Final Page).



*Id.* (red box added).

After the hyperlinks there are two checkboxes: (1) "The SSN I entered is my own;" and (2) "I agree to SoLo's Terms & Conditions," followed by a button "Looks Good, Let's Go." *Id*. Checchia checked both boxes and clicked the "Looks Good, Let's Go" button, which appears in the same blue-green color as the clickable hyperlinks. *Id*.; JA 43 (Muñoz Dec. ¶¶ 10-11).



JA 28-29 (Final Page) (purple box added).

Clicking the first of the six hyperlinks ("Terms of Service") causes a webview in the Mobile App to open enabling the user to view SoLo's Terms and Conditions. JA 43 (Muñoz Dec. ¶ 10). These Terms and Conditions are also accessible from every page of SoLo's website, including a hyperlink on SoLo's homepage and on the Mobile App. *Id*. at ¶ 14.



JA 29 (Final Page) (orange box added).

The other hyperlinks are for the "Privacy Policy," "E-Sign Disclosure," "SynapseFi's Terms of Service," "SynapseFi's Privacy Policy," and "Evolve's Deposit Agreement." *Id*. As explained in the Terms & Conditions, "[t]o obtain proceeds from Lenders in connection with Loans approved through the Platform, you will be required to open a checking account [] at Evolve Bank & Trust." JA 32. As explained in the Loan Agreement and Promissory Notes, Synapse is a payment

provider that may charge a transaction fee under certain circumstances. JA 37. The "Terms of Service," "Privacy Policy," and "E-Sign Disclosure" are the only hyperlinks not identified as being either "Evolve's" or "SynapseFi's." JA 29 (Final Page).

When the Terms of Service hyperlink is clicked, or the Terms and Conditions are otherwise accessed through the Mobile App or website, a document with the title "Terms" appears. JA 43 (Muñoz Dec. ¶ 10); JA 30 (Terms). The first paragraph states in pertinent part: "By using this mobile application (the "**Platform**"), establishing an account, or apply for a loan through the Platform (collectively the "**Services**"), you consent to these Terms and Conditions." JA 30. The second paragraph begins "These Terms and Conditions govern use of the Services." *Id.*

# Terms

View Deposit Agreement

THIS MOBILE APPLICATION IS POWERED BY SOLO FUNDS, INC. ("**SoLo**"). By using this mobile application (the "**Platform**"), establishing an account, or applying for a loan through the Platform (collectively, the "**Services**"), you consent to these Terms and Conditions, the SoLo Privacy Policy, and the E-SIGN Disclosure (collectively, the "**Agreement**") between you, the user ("**you**" or "**your**"), and us.

These Terms and Conditions govern use of the Services. Please note that your application for any loan through the Platform is subject to a separate agreement with the third party loan provider that will be provided to you upon application. THIS AGREEMENT DOES NOT COVER THE LOAN APPLIED FOR OR OBTAINED THROUGH THE PLATFORM, unless otherwise stated herein.

*Id.* (orange boxes added).

### 3.    The Arbitration Agreement

On the first page of the Terms, there is a notice in all bold and capital letters that the agreement includes an arbitration provision authorizing either party to elect mandatory and binding arbitration for certain disputes. *Id.*

**THIS AGREEMENT CONTAINS AN ARBITRATION PROVISION THAT AUTHORIZES EITHER PARTY TO ELECT MANDATORY AND BINDING ARBITRATION OF CERTAIN DISPUTES WHERE PERMITTED BY LAW. THE TERMS OF THE ARBITRATION PROVISION ARE SET FORTH IN THE SECTION ENTITLED "RESOLUTION OF DISPUTES BY ARBITRATION." PLEASE READ THIS ARBITRATION PROVISION CAREFULLY.**

*Id*.

Checchia has not challenged whether his claims fall within the scope of the arbitration agreement or the conspicuousness of the arbitration clause in the Terms. *See* Dkt. 12 (Response), 14 (Sur-Reply).

The Terms also includes a section titled "Governing Law": "[t]his Agreement is governed by California law." JA 34.

### 4.    Checchia Took out 19 Loans on the SoLo Platform

After creating his SoLo account on February 26, 2022 and checking the box next to "I agree to SoLo's Terms & Conditions," Checchia entered into nineteen individual loans through SoLo's lending platform, securing one to three loans every month following the creation of his account, with the final loan secured on the date he filed this suit. *See* JA 43 (Muñoz Dec. ¶¶ 8, 10-11); JA 46-48 (Wildeman Dec. ¶ 7). Each loan required Checchia to access the lending platform either through the

Mobile App or the website, both of which make the Terms available. *See* JA 43-44 (Muñoz Dec. ¶¶ 8, 14); JA 46 (Wildeman Dec. ¶ 7).

Each loan required Checchia to execute a Loan Agreement and Promissory Note. *See* JA 46-48 (Wildeman Dec. ¶¶ 7-8). Each such agreement was two pages long and included a section titled "Default." JA 37-38. (Note). In that section, there are four enumerated grounds to be deemed in default under the subject loan, one of which is "fails to abide by the terms of this Note or the SoLo Terms and Conditions." *Id*.

## B.    **Procedural History**

Checchia filed a class action complaint in the Philadelphia County Court of Common Pleas. Dkt. 1-2. SoLo timely removed the case to the U.S. District Court for the Eastern District of Pennsylvania, Philadelphia Division and then moved to compel arbitration. Dkt. 1 (Notice of Removal); Dkt. 8 (Motion). Checchia opposed SoLo's Motion to Compel Arbitration. Dkt. 12 (Response), 14 (Sur-Reply).

The District Court considered far more than Checchia's complaint. It considered evidence, exhibits, and statements attached to SoLo's Motion to Compel Arbitration as well as a written statement from Checchia, but there were no live witnesses and no depositions. JA 1-24 (Opinion). Checchia did not assert he had revoked his consent to the Terms. *See* JA 48 (Wildeman Dec. ¶ 9); JA 49 (Checchia Dec.). He did not assert he was unfamiliar with hyperlinks on mobile apps. *See* JA

49 (Checchia Dec.). He did not even assert he failed to see, read, or agree to the Terms. *See id*. Rather, the sole thrust of Checchia's written statement in opposition to the Motion to Compel Arbitration concerned his memory: it stated "I do not remember agreeing to the Terms" and "I also do not remember seeing, reading, or being presented the Terms." *Id*.

Checchia' s complaint did not include any screenshots of SoLo's Mobile App. Dkt. 1-2. The screenshots of the Final Page, the Terms, the Loan Agreements and Promissory Notes as well as declarations of Eddy Muñoz and Albert Wildeman were put into evidence by SoLo when it attached this documentation to its Motion to Compel Arbitration. *See* Dkt. 8.

Likewise, Checchia's litigation history and experience with other online lending platforms were not discussed in his complaint; rather, they were put into evidence by SoLo when it cited to the other litigation in its Reply to Plaintiff's Response in Opposition to the Motion to Compel. Dkt. 13 at 7, n. 16. SoLo's evidence included documents in the public record evidencing seven class actions Checchia had filed along with filings in two of those actions indicating he had secured over twenty advances through the online lending platforms Dave Inc. and Earnin. *Id*.

After briefing and oral argument, the District Court denied the Motion to Compel Arbitration, holding that SoLo failed to show that a valid arbitration

agreement existed between the parties due to the District Court's assessment that SoLo's Terms were not sufficiently conspicuous to put Checchia on notice of their existence. JA 18-23 (Opinion).

## STANDARD OF REVIEW

This Court reviews a denial of a motion to compel arbitration *de novo. Pei Chuang v. OD Expense LLC*, 742 Fed. Appx. 670, 673 (3d Cir. 2018). This Court exercises "plenary review over questions regarding the validity and enforceability of an agreement to arbitrate." *Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 177 (3d Cir. 2010); *see also James v. Global TelLink Corp.*, 852 F.3d 262, 265 (3d Cir. 2017).

A Rule 12(b)(6) standard applies when "it is apparent, based on the face of a complaint, and documents relied upon in the complaint" that a claim is subject to arbitration. *Guidotti v. Legal Helpers Debt Resol., LLC*, 716 F.3d 764, 776 (3d Cir. 2013). Otherwise, it is reviewed "under a summary judgment standard." *Id.*

Here, the summary judgment standard of Rule 56 of the Federal Rules of Civil Procedure should apply because both parties presented evidence outside of the four corners of the complaint and documents, and the District Court considered that evidence in reaching its decision. *See* JA 3-9 (Opinion). There is *de novo* review of summary judgments. *Cat Internet Services, Inc. v. Providence Washington Ins. Co.*, 333 F.3d 138, 141 (3d Cir. 2003).

# SUMMARY OF THE ARGUMENT

In denying SoLo's Motion to Compel, the District Court committed reversible error. Although the District Court correctly found that formation of a contract requires mutual manifestation of assent, the subsequent application of that fundamental principle was erroneous. JA 14. The court erred in large part because it over-extended jurisprudence related to browsewrap agreements instead of applying the fundamental principles of contractual formation that govern.

First, a reasonably prudent smartphone user would have had notice of the Terms and understood the implications of clicking the checkbox next to "I agree to SoLo's Terms & Conditions." The Final Page had a simple, uncluttered design, and the hyperlink to the Terms was reasonably conspicuous. *See* JA 28-29 (Final Page). The District Court erroneously applied browsewrap jurisprudence, despite the "I agree" checkbox providing clear notice. *See* JA 18-22. In addition, the District Court erroneously concluded that the hyperlink to the Terms was not reasonably conspicuous because it resembled the other hyperlinks with which it was grouped. JA 21. The test for differentiation is not whether it is set apart from the surrounding text but whether it is conspicuous.

The District Court reached this erroneous conclusion by applying browsewrap jurisprudence. *See* JA 18-22. However, those cases are focused on scenarios where a user needs to "ferret" out which text are hyperlinks where the hyperlinks are

secretly embedded in undifferentiated fine print text. In those cases a user has no way of knowing a hyperlink is present. Here, the hyperlink to the Terms was clearly differentiated and identified as such. *See* JA 29 (Final Page).

Specifically, the only surrounding text the hyperlink matched was other hyperlinks, the group of which were clearly separated from the rest of the page in a larger font size, a brighter font color, with greater line spacing and more empty space surrounding them than the preceding text. *See id*. The group of hyperlinks also immediately preceded two boxes the user must check before proceeding, ensuring that it is in a place where the user must draw his or her attention. *Id*.  In addition, the hyperlinks were of the same color font as the clickable button Checchia necessarily clicked to create his account. *Id*.; JA 43 (Muñoz Dec. ¶¶ 10-11).

Second, the District Court failed to consider the full context of the relationship Checchia was creating. Checchia downloaded the SoLo Mobile App to his phone, provided SoLo with a variety of highly sensitive personally identifiable information such as his social security number, created a user account, and entered into a forward-looking, long-term relationship with SoLo. *See* JA 42-43 (Muñoz Dec. ¶¶ 7-11); JA 46-48 (Wildeman Dec. ¶ 7). Checchia secured nineteen loans through SoLo's platform over the course of nearly a year, obtained and repaid thousands of dollars, paid SoLo donations and tips to lenders, and opened a checking account with

Evolve Bank as required by SoLo's Platform. *See* JA 46-48 (Wildeman Dec. ¶ 7); JA 32 (Terms).

Any reasonable consumer would understand that there was an agreement governing that extensive and ongoing relationship. In fact, the Terms were referenced in all nineteen notes Checchia executed and were available on all pages of SoLo's website and the Mobile App, demonstrating the frequency and extent to which he was put on notice that his engagement with the SoLo Platform was governed by the Terms. *See* JA 38 (Note); JA 48 (Wildeman Dec. ¶ 8); JA 44 (Muñoz Dec. ¶ 14). The nature of this relationship enhances the level of notice to, and due diligence expected of, Checchia, and further demonstrates Checchia assented.

Third, the District Court erred in failing to give appropriate weight to Checchia's failure to put forth evidence challenging the existence of an agreement to arbitrate. The Response includes speculative statements that Checchia may not have known the hyperlink to the Terms was a hyperlink, and may not have known that the Terms hyperlink was the one associated with the checkbox, however Checchia presented no evidence in support. *See* Dkt. 12 at 10-14 (Response).

Checchia failed to challenge or rebut the evidence in the Motion to Compel, including the statements made in the Wildeman and Muñoz declarations related to assent and the evidence related to Checchia's level of sophistication. *See* JA 44

(Muñoz Dec. ¶ 12); JA 48 (Wildeman Dec. ¶ 9); Dkt. 13 at 7, n. 16 (Reply). Checchia also failed to explain, for example, what he thought he was agreeing to when he checked the box. *See generally* Dkt. 12 (Response), 14 (Sur-Reply). Instead, in the Sur-Reply Checchia simply provided a self-serving and ineffective declaration stating he does not remember seeing the Terms. JA 49. In short, SoLo put forth prima facie evidence that Checchia assented to the Terms and Checchia failed to produce evidence to put the agreement to arbitrate into question.

Fourth, the District Court erred by denying the Motion to Compel without a trial on the issue of whether there was an agreement to arbitrate. *See* JA 25 (Order). Even if the District Court's decision to deny the Motion to Compel was correct, which it was not, there are certainly triable issues related to both actual and inquiry notice. Therefore, SoLo should be permitted to engage in discovery and provide evidence to a fact finder. Denying SoLo that right merely because it filed an unsuccessful dispositive motion would improperly treat arbitration agreements different than other contracts and create a standard at odds with the Federal Arbitration Act.

The District Court's Order should be reversed and the case remanded with instructions to order the Parties to arbitration or, in the alternative, remanded for a trial on the issue of whether there is an agreement to arbitrate.

# ARGUMENT

## A. A Binding Agreement to Arbitrate Exists Between the Parties Based Upon Checchia Clicking "I Agree to SoLo's Terms and Conditions."

### 1. Traditional Contract Principles Require Mutual Manifestation of Intent to be Bound.

The fundamental principles of contract formation in Pennsylvania and California are the same.[2] "In Pennsylvania, contract formation requires: (1) a mutual manifestation of an intention to be bound, (2) terms sufficiently definite to be enforced, and (3) consideration." *Dicent v. Kaplan University*, 758 Fed. Appx. 311, 313 (3d Cir. 2019). Under California law mutual assent is the touchstone of any enforceable contract. *Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855, 862 (2016).

Mutual assent "is determined under an objective standard applied to the outward manifestations or expressions of the parties, *i.e.* the reasonable meaning of their words and acts, and not their unexpressed intentions." *HM DG, Inc. v. Amini*, 219 Cal. App. 4th 1100, 1109 (2013); *Morales v. Sun Constructors, Inc.*, 541 F. 3d 218 (3d Cir. 2008).

---

[2] Because the Parties agreed during the District Court proceedings that there was no actual conflict between Pennsylvania and California law, the District Court applied the laws of each state interchangeably. *See* JA 14-15 (Opinion) quoting *Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir 2006) ("If there is no conflict, then the district court sitting in diversity may refer interchangeably to the laws of the states whose laws potentially apply."). SoLo will do the same throughout this brief. SoLo further addresses choice of law considerations in § D, *infra*.

"[W]hat is essential is not assent, but rather what the person to whom a manifestation is made is justified as regarding as assent." *Id*. at 222 quoting 1 Richard A. Lord, *Williston on Contracts* § 4:19 (4th ed. 2008).

In the District Court Checchia did not challenge whether the Terms are sufficiently definite or that consideration exists. *See generally* Dkt. 12 (Response), 14 (Sur-Reply). Instead, Checchia's position was that he didn't recall manifesting intent to be bound by the Terms. *See id*. However, by checking the box next to "I agree to SoLo's Terms & Conditions," the outward manifestation of Checchia's actions was clear. JA 29 (Final Page); JA 43 (Muñoz Dec. ¶ 11). This is particularly true since the Terms were available to him via a hyperlink on the screen of his smartphone at the same time he checked the box. JA 29 (Final Page).

Whether Checchia remembered choosing, reviewing, and understanding the Terms is immaterial because, as this Court found in *Morales*, 541 F.3d at 1074-75, rejecting a challenge to an arbitration agreement based upon being ignorant of the language in which the contract is written, it "was Morales' obligation to ensure he understood the Agreement before signing."

 The Pennsylvania Supreme Court agrees: "[c]ontracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood and irrespective of whether the agreements embodied

reasonable or good bargains." *Simeone v. Simeone*, 581 A.2d 162, 165 (Pa. 1990); accord *Brennan v. CIGNA Corp.*, 282 Fed. App. 132, 136 n.3 (3d Cir. 2008) (same).

California courts reach the same conclusion: "A party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing." *Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.,* 89 Cal. App. 4th 1042, 1049 (2001).

This Circuit's *Morales* decision makes clear that a contracting party has an obligation to engage in some due diligence. Ignorance is not an excuse to complying with contractual obligations, because it "will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained." *Morales*, 541 F.3d at 221; *see also Sheet Metal Workers Int'l. Ass'n Local Union No. 27, AFL-CIO v. E.P. Donnelly, Inc.*, 673 F.Supp.2d 313, 328 (D.N.J. 2009) ("Walking blindfolded through one's business affairs does not excuse the ensuing collision."); *MZM Construction Co., Inc. v. New Jersey Building Laborers Statewide Benefit Funds*, 974 F.3d 386, 403 (3d Cir. 2020) (rejecting the plaintiff's challenge to having knowledge of and assenting to the terms in a collective bargaining agreement that was incorporated by reference into an executed agreement, noting that she never asked to see the incorporated agreements nor contends she would have been refused if she did, demonstrating the need to exercise due diligence).

This level of due diligence is enhanced when the agreement is not fleeting but rather contemplates a forward-looking, ongoing relationship. *See, e.g., Meyer v. Uber Tech*, 868 F.3d 66, 75 (2d Cir. 2017) (explaining that the registration process contemplated a continuing relationship that would require some governing terms and conditions); *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 477 (2021) (explaining that the context of the transaction impacts sufficiency of notice); *Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 869 (9th Cir. 2022) (concurrence explaining more exacting standard applies during one-off transactions).

Under traditional contract principles, Checchia expressly agreed to SoLo's Terms & Conditions when he checked the box. That should end the inquiry and this Court should give effect to Checchia's unequivocal action, particularly where it arises in the context of a forward-looking relationship. It is immaterial whether he remembers if he inquired what the language meant. The Terms were available to be viewed by clicking the Terms hyperlink (among other ways), and it is obvious to any reasonable user that a forward-looking relationship will be governed by a set of terms. JA 43-44 (Muñoz Dec. ¶¶ 10, 14); *Meyer,* 868 F.3d at 75. The question is not whether he did take that next step, only whether he had a reasonable opportunity to do so. Also recall, he has not denied that he saw the Terms; he only denies remembering that he saw them. JA 49 (Checchia Dec.).

### 2. Internet-Based Agreements are Governed by the Same Principles as Traditional Contracts.

Courts must "apply ordinary state-law principles that govern the formation of contracts[]" when determining whether a valid arbitration agreement exists. *James*, 852 F.3d at 265; *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."). And, "[w]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Nguyen v. Barnes & Noble, Inc.,* 763 F.3d 1171, 1175 (9th Cir. 2014); *Register.com, Inc. v. Veiro, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004) *see also Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1220 (9th Cir. 2019) ("Just as we have applied traditional contract principles to online contracts, we do so here too [in the context of smartphone applications].").

"One such principle is the requirement that mutual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." *Nguyen*, 763 F.3d at 1175; *see also Dicent*, 758 Fed. Appx. at 313.  "As with paper contracts or shrinkwrap agreements, to be bound, an internet user need not actually read the terms and conditions or click on a hyperlink that makes them available as long as she has notice of their existence." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 232 (2d Cir. 2016).

### 3. Courts Developed Shorthand Terms "Clickwrap" and "Browsewrap" to describe Commonly Encountered Fact Patterns.

When assessing the enforceability of Internet-based agreements, courts initially developed a shorthand while reviewing website-based agreements. These contracts were generally lumped into one of two categories: "'clickwrap' (or 'click-through') agreements, in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use; and 'browsewrap' agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen." *Nguyen*, 763 F.3d at 1175-76; *see also Huuuge*, 944 F.3d at 1220; *Lee v. Ticketmaster LLC*, 817 F. App'x 383, 394 (9th Cir. 2020).

"Courts routinely uphold clickwrap agreements." *HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 331 (W.D. Pa. 2020) (quoting *Meyer*, 868 F.3d at 75. This is because in the clickwrap scenario, "the consumer has received notice of the terms being offered, and in the words of the Restatement, knows or has reason to know that the other party may infer from his conduct that he assents to those terms." *Berman*, 30 F.4th at 856.

In contrast, courts are "more reluctant to enforce browsewrap agreements because consumers are frequently left unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms." *Id.*; *see also James*, 852 F.3d at 267 ("In browsewrap

27

agreements, a company's terms and conditions are generally posted on a website via hyperlink at the bottom of the screen. Unlike online agreements where users must click on an acceptance after being presented with terms and conditions, [] browsewrap agreements do not require users to expressly manifest assent"). The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists." *Nguyen*, 763 F.3d at 1176 quoting *Be In v. Google*, No. 12-cv-03373, 2013 WL 5568706 at *6 (N.D. Cal. Oct. 19, 2013).

"Because no affirmative action is required by the website user to agree to the terms of a contract other than his or her use of the website, the determination of the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." *Id*. quoting *Van Tassell v. United Mktg. Grp., LLC*, 795 F.Supp.2d 770, 790 (N.D. Ill. 2011). In light of the absence of conduct, such as clicking a button stating "I agree," the question of "whether the terms or a hyperlink to the terms are reasonably conspicuous on the webpage" drives the analysis of browsewrap cases. *See Berman* 30 F.4th at 856.

Therefore, "where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, courts have been more amenable to enforcing browsewrap agreements." *Id*. The fundamental principle continuing to be that there needs to be an objective manifestation of assent.

When a hyperlink states that by continuing to use the website you agree to the terms, the critical question is whether the user is or should be aware of the terms. If the terms or hyperlink are conspicuous, whether based upon style or direct notice, then it is objectively reasonable to infer an intention to be bound. However, if the terms or hyperlink are buried on the website or made indistinguishable from surrounding text and the user is not provided notice of their existence, then there is no way to impute intention to be bound on continued use of the website.

*Berman*, 30 F.4th 849 is a textbook example of unenforceable browsewrap and was a case the Checchia and the District Court erroneously relied upon extensively. *See* JA 15-21 (Opinion); Dkt. 12 at 11-12 (Response), Dkt. 14 at 3-4 (Sur-Reply).

Berman is inapposite. The *Berman* defendant was a digital marketing company that generated leads for clients by collecting information about visitors to its websites. *Id*. at 853. To entice visitors and secure contact information, the defendant offered gift cards and free product samples and then used the information it received for marketing campaigns. *Id*.

One plaintiff accessed the site via the Internet on a computer, which had a webpage with: large, colorful graphics, text, and images; a large field to enter a zip code in large font; and tiny text beneath that, followed by two green boxes with large-font text. *Id*. "Between the comparatively large box displaying the zip code

and the large green 'continue' button were two lines of text in a tiny gray font, which stated: 'I understand and agree to the Terms & Conditions.'" *Id*. at 854 "Terms & Conditions" was a hyperlink, but it "appeared in the same gray font as the rest of the sentence, rather than in blue, the color typically used to signify the presence of a hyperlink." *Id*.

The other plaintiff visited the defendant's website using a mobile phone. *Id*. The website included a colorful image followed by fields to input data, and then a "large green button with text that stated, in easy-to-read white letters, 'continue.'" *Id*. As with the other website, sandwiched between the eye-catching buttons "were the same two lines of text in tiny gray font" with the hyperlink matching the rest of the sentence. *Id*.

*Berman* explained that "[t]o avoid unfairness of enforcing contractual terms that consumers never intended to accept, courts confronted with online agreement such as those at issue here have devised rules to determine whether meaningful assent has been given." *Id*.

Those rules require the website operator to show actual knowledge of the agreement, or that the website provides reasonably conspicuous notice of the terms and the consumer takes some action, "such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id*. In short, there needs to be an outward manifestation of assent.

With context provided by the relevant facts in *Berman,* the court's explanation of its reasoning and criteria for enforceable browsewrap agreements is sensible and consistent with traditional principles of contract formation. But the facts and context of *Berman* are not applicable here, and the District Court erred in relying on *Berman*, as the next two sections of this brief explain.

4.    **The Clickwrap and Browsewrap Jurisprudence is of Limited Utility When Analyzing Materially Different Fact Patterns That Instead Should be Considered Through the Lens of the Fundamental Principles of Contract Formation.**

As online agreements have evolved, Courts have recognized that not all Internet-based contracts fall neatly into either a browsewrap or clickwrap category. *See, e.g.,* JA 17 (Opinion). However, the case law has not kept up with these developments. For example, the legal analysis relevant to traditional browsewrap is often mistakenly extended to agreements that involve different considerations than whether otherwise innocuous conduct (*i.e.* browsing a website) is transformed into a manifestation of assent based upon whether the user is provided with conspicuous notice of how their actions will be interpreted.

Here, the District Court and Checchia relied heavily upon *Berman* despite this case involving active assent from which inferences are not required (clicking a button stating "I agree to SoLo's Terms & Conditions") rather than passive assent (navigating a website where non-interactive notice informs the user that doing so means the user is entering into an agreement) which necessarily turns on inferences.

*See, e.g. Nguyen*, 763 F.3d at 1176 (explaining notice is critical in browsewrap cases because the user otherwise would have no reason to know they are agreeing to any terms); JA 17-21 (Opinion); Dkt. 12 at 11-12 (Response), Dkt. 14 at 3-4 (Sur-Reply).

This extension of browsewrap analysis to non-browsewrap scenarios is particularly problematic when dealing with mobile applications that generally do not mirror traditional web browser formatting and therefore raise fundamentally different issues. Certainly some mobile applications can mirror websites such as the ones in *Berman*, but more often mobile applications are less cluttered, contain less content on a single screen, require less scrolling, and lack inconspicuous hyperlinks buried on the bottom of each screen.

In addition, the transaction context of mobile applications is different. *See, e.g. Meyer*, 868 F.3d at 77("[s]martphone users engage in these activities through mobile applications," "[t]o begin using an app, the consumers need to locate and download the app, often from an application store").

Moreover, users generally engage with mobile applications using their fingers rather than an external device such as a mouse, and the content is more uniformly formatted due to device constraints.

Few courts have considered the unique aspects of mobile applications as it relates to the issue of assent, and therefore the browsewrap and clickwrap analyses are of limited utility. It is respectfully submitted that it is a mistake for courts to rely

on these inapposite paradigms. Rather, it is submitted that a proper legal test requires a case-by-case analysis predicated upon the fundamental contractual principles. Browsewrap and clickwrap are simply the generic descriptions of purportedly common fact patterns to which fundamental contract principles have been applied. To extend decisions based on a simply browsewrap/clickwrap analysis to factually distinct scenarios undermines those very same fundamental contract principles.

a.    *The District Court Erroneously Relied Upon* Berman *which Involves Materially Different Facts.*

Despite *Berman* arising from a textbook case of browsewrap, the District Court treated *Berman* as creating a new standard for contract formation leading to a misapplication of the analysis contained therein. *Id*. In fact, the District Court exclusively looked to the **hyperlink** when applying *Berman* to determine whether there was reasonably conspicuous notice. *See id*. at 20. However, *Berman* provides that the **notice** "must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Berman*, 30 F.4th at 856.

*Berman* was merely analyzing highly problematic browsewrap and explaining why there could be no objective manifestation of assent from navigating the website. In fact, *Berman*'s analysis of hyperlinks was effectively irrelevant because it found that the notices on the two websites were themselves barely legible to the naked eye. Therefore, it was ultimately irrelevant whether the hyperlink was sufficiently

differentiated within this inconspicuous notice. The hyperlink was inconspicuous because the notice was inconspicuous. That is not the situation here.

Moreover, the first sentence of *Berman* acknowledges its significant limitation: "We revisit an issue first addressed by our court in *Nguyen* []: Under what circumstances can the use of a website bind a consumer to a set of hyperlinked 'terms and conditions' that the consumer never saw or read." *Id*. at 853.

Critically, (1) there was evidence that the plaintiffs did not see the notice with the hyperlink; (2) the cluttered websites had significant design elements that disguised and drew attention away from the notice and hyperlink making it reasonable a user would not see it; (3) the only outward conduct that could be deemed manifestation of assent was clicking a button on the website which, sans the notice, could not possibly evidence assent; and (4) the parties were relative strangers with no ongoing relationship. *Id*. at 853-58, 868-69.

Here, by contrast (1) there was no evidence that Checchia did not see the notice regarding the consequence of clicking the checkbox or the hyperlink itself; (2) the Mobile App was uncluttered and draw the users attention to the hyperlink; (3) the outward manifestation of assent is checking a box stating "I agree to SoLo's Terms & Conditions" which plainly expresses a manifestation of assent; and (4) involved parties entering into an ongoing relationship. *See* JA 49(Checchia Dec.);

JA 29 (Final Page); JA 46-48 (Wildeman Dec.). Compare the screenshots from

*Berman* with the Final Page:



*Berman*, 30 F.4th at 859.



*Id.* at 861, JA 29.

Yet, the District Court cited *Berman* for this proposition that to be reasonably conspicuous, "a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent internet user would have seen it," and found it was lacking by focusing on the hyperlink. JA 20.

However, in *Berman* the text was (1) considerably smaller that the surrounding website elements; (2) "so small that it is barely legible to the naked eye;" (3) surrounded by comparatively larger font which naturally directs the user attention elsewhere. 30 F.4th at 856-57. Simply put, "the design and content of these webpages draw the user's attention away from the most important part of the page." *Id.* at 857.

By contrast, the text of the hyperlinks in the Mobile App were (1) larger than the surrounding website elements; (2) easily legible; (3) contained in an especially uncluttered area of the screen. JA 28-29 (Final Page). In short, unlike *Berman* where the website was designed to distract, the Mobile App here draws the users attention to the hyperlinks and the notice. *See id.; Berman,* 30 F.4th at 856-57.

It is also in the context of *Berman* that the District Court asserted that "[a] web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently 'set apart' from the surrounding text," and that contrasting font and all capital letters are customary design elements to denote the existence of a hyperlink. JA 21.

The websites in *Berman* had simply underlined small gray font that matched the text of the sentence in which it was contained, and was smaller than the surrounding text. *Berman,* 30 F.4th at 856-57. By contrast, here the hyperlinks are a bright colorful font surrounded by achromatic elements, in a larger font, bold, and spaced apart more than the surrounding text. *See* JA 28-29 (Final Page). The hyperlink in *Berman* was designed to be overlooked. The hyperlink in SoLo's Mobile App is designed to be seen. Compare *id.* with *Berman* at 859-60.

By trying to fit a round peg in a square hole and apply analysis meant for entirely different fact patterns to this Case, the District Court clearly erred. Simply put, *Berman* is inapposite, and the facts of *Berman* when contrasted with the facts in this case demonstrate why arbitration must be compelled.

> **5.    The Final Page Contains Design Elements that Make Any Reasonably Prudent User Aware of the Terms and the Import of the Act of Clicking the "I agree" Checkbox.**

As discussed *supra*, in contrast to *Berman* the Final Page is designed to put any reasonably prudent user of the Mobile App on notice that by clicking the box next to "I agree to SoLo's Terms & Conditions," the person is agreeing to be bound by the Terms. *See* JA 29 (Final Page). At the simplest level, the "I agree" language was conspicuous and there is no dispute Checchia checked the box. *Id*.; JA 43 (Muñoz Dec. ¶ 11). Therefore, he had actual knowledge that he was agreeing to "SoLo's Terms & Conditions." Further, the hyperlink to the Terms was sufficiently

conspicuous to bind Checchia even if he had not affirmatively communicated his assent, which he did. *See* JA 29 (Final Page).

The hyperlink was (1) in a font larger than the preceding text; (2) in eye-catching blue-green font set on a white background and surrounded by achromatic text; (3) in bold; (4) with 'Terms' and 'Service' capitalized indicating it is a title of a document; (5) bearing a name that is a title of a document where the surrounding text, besides the other hyperlinks, are all sentences; (6) with large amounts of blank space to its right where the remainder of the Final Page is largely filled with text; and (7) was on the screen simultaneously with Checchia checking the box "I agree to SoLo's Terms & Conditions" which was reached only after scrolling past the link to the Terms. *Id.* In short, it was conspicuous.[3]

Notwithstanding, the District Court provided three erroneous reasons to support its conclusion that the notice was not reasonably conspicuous. *See* JA 19-22 (Opinion). First, it found the hyperlink to the Terms was not in close proximity to

---

[3] By way of example, the Pennsylvania legislature defined "conspicuous" in the context of Pennsylvania's Uniform Commercial Code as: "so written, displayed or presented that a reasonable person against which it is to operate ought to have noticed it." 13 Pa.C.S.A. § 1201(10). "Conspicuous terms include the following: (i) A heading in capital equal or greater in size than the surrounding text, or in contrasting type, font or color to the surrounding text of the same or lesser size. (ii) Language in the body of a record or display in larger type than the surrounding text, in contrasting type, font or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language." *Id.* The design elements would clearly qualify under this standard.

the "I agree" checkbox. JA 20-21. Second, it found that the hyperlink was not differentiated from the surrounding text because it was the exact same font size and color as the five lines of text directly beneath it and approximately the same size as the text associated with the two checkboxes that follow it and lacks the traditional indicia of hyperlinks such as underlines and capitalization. JA 21. Third, it found it is not a clear a user clicking on the "I agree" checkbox would know Terms & Conditions referenced the Terms available through the hyperlink titled "Terms of Service." JA 21-22. Each of these findings is based upon a misapplication of the law.

> *a.    The Hyperlink was in Close Proximity to the "I Agree to SoLo's Terms & Conditions" Checkbox and this Consideration is of Minimal Significance in this Case.*

The District Court found that the hyperlink to the Terms was located seven lines above the "I agree" checkbox and is therefore not in close proximity. JA 20-21. This conclusion is factually incorrect and is also predicated upon a misunderstanding of the cases purportedly supporting its relevance.

First, the hyperlink to the Terms was on the same screen as the "I agree" checkbox when the box was clicked by Checchia. *See* JA 29 (Final Page); JA 43 (Muñoz Dec. ¶ 11). This stands in stark contrast with *Brooks v. IT Works Marketing, Inc.*, No. 1:21-cv-1341, 2022 WL 2079747 (E.D. Cal. Jun. 9, 2022), which was relied upon by the District Court, where the hyperlink to the terms was buried at the bottom of the website in small font. *See* JA 16, 20 (Opinion).

*See Brooks v. IT Works Marketing*, Case No. 1:21-cv-01341 (E.D. Cal. Nov. 23, 2021) (Dkt. 18-2 at 65) (red boxes added to identify location of "I Agree" button and Terms of Use).

Moreover, as part of the checkout process in *Brooks,* the user was provided a copy of a document titled "Terms & Conditions" that was available to scroll through on the website, followed by a button "I AGREE TO ALL TERMS &

CONDITIONS", followed by a statement "I electronically acknowledge reading and understanding the above Terms & Conditions . . ." and then half a page below in small non-descript font a hyperlink to the Terms of Use appeared. *Brooks,* 2022 WL 2079747 at *7. The plaintiff attempted to argue that the word **All** in the "I agree" checkbox signified that it did not just relate to the Terms & Conditions clearly provided, but also the separate Terms of Use buried at the bottom of the page. *Id*.

The court in *Brooks* was concerned that a reasonably prudent user would not understand that the checkbox was intended to reflect assent to an additional agreement located far below the checkbox. As the website was presented, a user would need to scroll to the bottom of the page to even be aware that there is an additional set of terms and the surrounding text suggested such scrolling was not necessary. *Id*. Proximity of the hyperlink was significant because it was the only reason the user could have reason to know that their action may signify assent to an additional agreement. *See id.* But that is not the case here.

That said, proximity of the hyperlink to the act of assent is rarely visited by Courts. Instead, the proximity analysis comes into play in connection with most browsewrap agreements where the action evidencing assent (*i.e.* navigating a website) can only reflect an outward manifestation of assent if the notice is in close proximity to the user's conduct so that the user is aware of the import of his or her

activity on the website. *See Nguyen*, 763 F.3d at n. 1 citing *Zaltz v. JDate,*, 952 F.Supp.2d 439, 451-52 (E.D.N.Y. 2013).

In *Zaltz*, the Court found assent existed, explaining "[u]nlike the license terms at issue in *Specht*, defendants reference to its Terms and Conditions of Service appear on the same screen as the button a prospective user must click in order to move forward with the registration process." *Id*. at 453. The Court continues: "Plaintiff did not need to scroll or change screens in order to be advised of the Terms and Conditions; the existence of, and need to accept and consent to, the Terms and Conditions of Service was readily visible." *Id*. The Court then expands upon the issue of location, contrasting a sign-up where the operative link is below the button to click, explaining the terms "appear *above* the button [], thereby making it even more clear that prospective members [] are aware that by clicking the button to move forward in the registration process, they manifest their assent to the Terms [] referenced above." *Id*. at 453-54 (emphasis in original).

Here, the hyperlink was located above (and on the same screen) as the checkbox and the "Looks Good, Let's Go" button ensuring users are aware of the hyperlink. JA 29 (Final Page). In short, it is in close proximity. The District Court found it critical that the hyperlink was not within the "I agree to the Terms &

Conditions" language, but while that may make the Terms even more conspicuous,[4] there is no authority stating such incorporation is essential. *See* JA 18 (Opinion). Yet, the District Court erroneously treated a difference of inches as dispositive regarding conspicuousness, using that as the sole grounds to determine this case did not involve enforceable 'clickwrap.' *Id.*

      b.    *The Hyperlink to the Terms Were Differentiated From the Surrounding Text and Clearly Identified as a Hyperlink.*

The District Court found that the hyperlink to the Terms lacked "traditional indicia of hyperlinks, such as underlines and capitalization." *Id.* The District Court also found the hyperlinks were not conspicuous because they were "the same exact font size and color as the five lines that appear directly beneath it," and "is also approximately the same font size as" the language next to the checkboxes. *Id.* Therefore the District Court concluded that the hyperlink as "devoid of features to set it apart from the surrounding text." *Id.* Both conclusions were in error.

Although all-capital letters and underlining may in some instances signal a hyperlink, they are not the exhaustive method of demonstrating a hyperlink exists. For example, *Oberstein v. Live Nation Entertainment, Inc.*, 60 F.4th 505 (9th Cir. 2023) analyzed a mobile application and found that "crucially, the 'Terms of Use' hyperlink is conspicuously distinguished from the surrounding text in bright blue

---

[4] In fact, at Oral Argument Checchia's Counsel conceded there would be no dispute on assent had the hyperlink been located in that statement. Dkt. 29, 35:3-36:2.

font, making its presence readily apparent." *Id*. at 516. The only indicia cited by the Court was the bright blue font and a review of the District Court's order which includes an image of the link reveals that this, together with capitalizing the first letter of the words besides 'of,' were the design elements to identify it as a hyperlink. *See Oberstein v. Live Nation Entertainment, Inc.*, No. 20-cv-3888, 2021 WL 4772885 at *2 (C.D. Cal. Sep. 20, 2021). Contrasting the Mobile App with what was deemed conspicuous in *Oberstein* can lead to no conclusion other than that the hyperlinks on the Mobile App were conspicuous. Compare *id*. with JA 28-29 (Final Page).



*Oberstein,* 2021 WL 4772885 at *2 (red boxes added).

To find otherwise, the District Court exclusively focuses on elements of the text that follows the hyperlink to the Terms without regard to the overall design elements of the Final Page[5] or the purpose of differentiating hyperlinks from the surrounding text. *See* JA 21 (Opinion). Specifically, the purpose of differentiating hyperlinks is because "Consumers cannot be required to hover their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to 'ferret out hyperlinks.'" *Id*. quoting *Berman*, 30 F.4th at 847. However, nothing about the hyperlink to the Terms makes it 'plain-looking text' that would require a user to 'aimlessly click.' *See* JA 29 (Final Page).

---

[5] In fact, the District Court's even truncates one of the screenshots of the Final Page to omit everything that precedes the hyperlink. *Id.*

The Final Page consists of a few sections. *See id.* It begins with a series of interactive boxes in which information such as name, address, date of birth, and social security number appear justified across the entire screen. *Id*. That section is separated by a medium-sized space from the following section. *Id*. This section includes four numbered sentences presented in achromatic font, each of which occupies the vast majority of the space in which it appears in lines spaced closely together. *Id*. Then, there is another medium-sized space followed by additional text matching the preceding section in all material ways. *Id*.



*Id*.

After that series of achromatic, page-filling text with small spacing, there is another medium-sized space, followed by the six hyperlinks that are clearly differentiated from the rest of the screen. *Id*. Specifically, each hyperlink:

1. appears in blue-green font rather than the achromatic font that immediately precedes it and follows it;

2. contains greater spacing between lines than the previous section, drawing the users eye to the section;

3. consists of two to four words instead of full sentences like the preceding and subsequent sections of text;

4. capitalizes the first letter of each word other than 'of,' which commonly signals the title of a document or other formal identifier, unlike the surrounding sections of text that entirely consists of sentences;

5. is in bold font unlike the surrounding sections of text which are not; and

6.  is in a font size larger than the sections of text precede the group of hyperlinks.

*Id*.

Any user of the Mobile App is naturally drawn to the group of hyperlinks which stand out from the surrounding text. *See id.* In addition, the following section was set apart by medium spacing, followed by the two checkboxes Checchia clicked, including one stating "I agree to the Terms & Conditions." *Id*. This design has the natural effect of causing the user to look at the preceding group of hyperlinks to see what they are agreeing to by checking the box. *See id.*

In essence, the District Court's conclusion is that by neatly organizing a group of six hyperlinks using conspicuous design elements, those hyperlinks become inconspicuous because they resemble each other. In fact, the landing page of this Court's own website uses very similar design elements to those in the Mobile App for its hyperlinks, none of which are underlined and many of which are grouped together in convenient sections of hyperlinks.



*See* https://www.ca3.uscourts.gov (last visited November 26, 2023). The above screenshot is of groups of hyperlinks towards the bottom of the homepage.

Based upon the District Court's analysis, hyperlinks cannot be grouped together or they cease to be conspicuous (unless each hyperlink is presented in a different color and in a different size font than the others, for example). This is simply form over substance leading to an erroneous conclusion.

     *c.*    *The Use of Terms of Service in the Hyperlink does not defeat Checchia's assent to the Terms.*

Formation of the agreement is not defeated because the hyperlink to the Terms is labelled "Terms of Service" while the checkbox states "I agree to the Terms & Conditions." *See* JA 29 (Final Page). These terms can be used interchangeably,[6] from context it is clear to what the "I agree" button references, and the Terms identify themselves as the "Terms and Conditions" in both of the first two paragraphs of the agreement, ensuring even a modicum of due diligence would resolve any ambiguity. *See id.;* JA 30 (Terms). Moreover, Checchia presented no evidence they he was confused by the naming convention. *See* Dkt. 12 (Response), 14 (Sur-Reply).

In *Meyer*, the Court upheld enforcement of an arbitration clause where these terms were used interchangeably. 868 F.3d at n. 4 ("Although the hyperlink on the Payment Screen referenced 'Terms of Service,' the following screen referenced 'Terms and Conditions.' Because the initial hyperlink, which defendant argues notified Meyer of the arbitration clause, refers to the relevant agreement the Terms of Service, we use that title throughout this opinion."). In fact, despite stating the

---

[6] The Wikipedia entry for "Terms of service" states: "also known as terms of use and terms and conditions." Although not a formal source of definition, this demonstrates common usage of the terms. *See* https://en.wikipedia.org/wiki/Terms_of_service*; see generally Commonwealth v. Gamby*, 283 A.3d 298 at 311, n. 18, 52 (Pa. 2022) (acknowledging Wikipedia's relevance to determining common usage of language).

Court would use 'Terms of Service' throughout the opinion, it too vacillated, twice using "Terms and Conditions" to describe the Terms of Service. *Id*. at 71; *see also White v. Ring*, No. 22-cv-6909, 2023 WL 1097554 (C.D. Cal. Jan. 25, 2023) (enforceable arbitration agreement where user was presented with prompt to review the "Terms and Conditions" that hyperlinked to the Terms of Service).

Further, the "I agree" box put Checchia on notice that he was agreeing to certain terms. *See* JA 29 (Final Page). Even if any ambiguity did exist through the use of the interchangeable terms, it was easy to resolve. There were six hyperlinks presented:

1. Terms of Service

2. Privacy Policy

3. E-Sign Disclosure

4. SynapseFi's Terms of Service

5. SynapseFi's Privacy Policy

6. Evolve's Deposit Agreement.

*Id*.

The last of these can quickly be eliminated as a potential source of confusion, it identifies the hyperlink as relating to a document concerning a 'deposit agreement' belonging to "Evolve." *See id.* The fourth and fifth can be eliminated for the same reasons, they are identified as being SynapseFi's Terms of Service and SynapseFi's

Privacy Policy, not SoLo's. *See id.* This leaves three hyperlinks, only one of which could possibly be thought to be what "Terms & Conditions" was referencing, "Terms of Service," the phrase used interchangeably with and closely resembling Terms & Conditions.[7] *See id.*

The District Court said it found confusion due to the presence of "SynapseFi's Terms of Service." JA 22 (Opinion). However, there is no plausible reason one would think that between the two, the "I agree to SoLo's Terms & Conditions" button relates to one of the links titled Terms of Service, the one identified as belonging to a third party was the correct one. *See* JA 29 (Final Page). Rather, a reasonably prudent user of SoLo's Mobile App would understand the link to "Terms of Service" to be a reference to SoLo's own Terms. *See id.*

Had SoLo not also presented a third parties terms on the same page, any designation of the hyperlink as "SoLo's" Terms would be odd. Obviously the terms presented by SoLo are their own unless specified otherwise.

On this Circuit's website there is a hyperlink to "Privacy Policy." It is not necessary to explain it is the Third Circuit's privacy policy.[8] In fact, by specifically referencing **SoLo's** Terms & Conditions in the 'I agree' statement, SoLo was

---

[7] Unless Checchia believed Terms & Conditions referenced all six links as a group, in which case he assented to the Terms regardless.

[8] *See* https://www.ca3.uscourts.gov (last visited November 26, 2023).

making it clear that it did not relate to **SynapseFi's** terms and necessarily related to the "Terms of Service." *See id*.

Lastly, even if any uncertainty did exist, it would have easily been resolved by clicking the hyperlinks. *See* JA 43 (Muñoz Dec. ¶ 10); JA 30 (Terms). The Terms hyperlink takes the user to the Terms in which it is referenced as the "Terms and Conditions" multiple times on the first page as well as being an agreement with SoLo. *Id*. Therefore, even if some minor ambiguity could exist, it would be resolved by the slightest degree of due diligence conducted in order to ensure the user does in fact agree to SoLo's Terms & Conditions before expressing assent by checking the box. The District Court's conclusion would effectively absolve parties to a contract of being required to conduct any due diligence with respect to the impact of their actions, and would reward individuals that walk blindly through their affairs. *See, e.g. Simeone*, 581 A.2d at 165.

In sum, the District Court erred in finding the Terms were not reasonably conspicuous and that Checchia did not assent to the Terms when he clicked "I agree to SoLo's Terms & Conditions."

**B.**    **An Agreement to Arbitrate Exists Between the Parties Based Upon the <u>Full Context of the Transaction and Checchia and SoLo's Relationship.</u>**

Even if clicking "I agree to SoLo's Terms & Conditions" was not sufficient to establish assent (it is), the full context of the transaction and nature of the relationship between Checchia and SoLo must be considered. *See, e.g. Sellers*, 73

Cal. App. 5th at 477 ("the full context of the transaction is critical to determining whether a given textual notice is sufficient to put an internet consumer on inquiry notice of contractual terms"); *Berman*, 30 F.4th at 869 (the concurrence endorsed *Sellers*, explaining that "[u]nder *Sellers*, we must hold defendants to the most exacting standard because the transactions at issue were one-off," demonstrating the added scrutiny the agreements in *Berman*).

*Sellers* noted that that "the majority of the federal cases finding an enforceable sign-in wrap agreement involve continuing, forward looking relationships." *Sellers*, 73 Cal App. 5th at 476. In *Sellers* the transaction involved a one-time trial purchase where an answer to a single question was given for $5. *Sellers*, 73 Cal. App. 5th At 480. The transaction did not require submitting sensitive personally identifiable information such as a social security number and was specifically identified as being a "trial," signifying it would not create an ongoing relationship. *See generally id*. Therefore, *Sellers* affirmed denying a motion to compel arbitration.

By contrast, *Meyer* vacated a denial of a motion to compel arbitration, explaining "[t]he transaction context of the parties' dealings reinforces our conclusion. Meyer located and downloaded the Uber App, signed up for an account, and entered his credit card information with the intention of entering into a forward-looking relationship with Uber." *Meyer*, 868 F.3d at 80. *Meyer* pointed out that the transaction context is significant because the "registration process clearly

contemplated some sort of continuing relationship between the putative user and Uber, one that would require some terms and conditions, and the Payment Screen provided clear notice that there were terms that governed that relationship." *Id.*; *see also Selden v. Airbnb, Inc.*, No. 16-cv-00933, 2016 WL 6476934 (D.D.C. Nov. 1, 2016) ("The act of contracting for consumer services online is not commonplace in the American economy. Any reasonably-active adult consumer will almost certainly appreciate that by signing up for a particular service, he or she is accepting the terms and conditions of the provider.); *B.D. v. Blizzard Entertainment, Inc.*, 76 Cal. App. 5th 931, 950-51 (2022) (finding the full context of the transaction involving a minor making an in-game purchase in a videogame contemplated a forward-looking relationship governed by terms and conditions).

Here, Checchia entered his name, address, date of birth, phone number, social security number, made representations related to Internal Revenue Service backup withholdings, and then proceeded to secure nineteen loans through SoLo's platform. JA 43 (Muñoz Dec. ¶¶ 9-10); JA 28-29 (Final Page); JA 46-48 (Wildeman Dec. ¶ 7). The nature of the transaction is far more like *Meyer* and supports a reasonably prudent person knowing that terms and conditions would govern the relationship.

Moreover, each of the nineteen loans Checchia secured through that relationship over the course of nearly a year made reference to the Terms and

Conditions, and each time he visited the Mobile App or website the Terms and Conditions were available to him. JA 44 (Muñoz Dec. ¶ 14); JA 37-38 (Note).

Therefore, the nature of the transaction supports an expectation by users such as Checchia that the ongoing relationship will be governed by terms and conditions, thereby bolstering the conspicuousness of the already conspicuous notice. *See, e.g. Berman*, 30 F.4th at n. 6 ("if defendants' websites involved ongoing dealings, *Sellers* suggests that reasonably prudent users would expect there to be terms and conditions or fine print). Taken together with the design elements, the evidence of Checchia's assent to the Terms is overwhelming. Although the District Court found otherwise based upon the errors discussed *supra*, this Court is empowered to correct that error through its *de novo* review.

## C.    **Checchia Failed to Contest Any Evidence Related to Assent.**

SoLo made a prima facie showing that there was an agreement to arbitrate. SoLo presented screenshots of the Final Page coupled with a declaration establishing that Checchia checked the box next to "I agree to SoLo's Terms & Conditions" evidencing assent to the Terms. JA 29 (Final Page); JA 43 (Muñoz Dec. ¶ 11).

In addition, SoLo submitted two declarations in support of its Motion to Compel Arbitration, both of which either provide that Checchia accepted the Terms or did not reject the Terms. *See* JA 43 (Muñoz Dec. ¶ 8) ("no user could lend or borrower money via SoLo's Platform without first creating an account, which

required acceptance of the then-current version of SoLo's Terms and Conditions"); *Id.* at ¶ 12 ("By creating his SoLo account on February 26, 2022, Checchia agreed to SoLo's then-current Terms and Conditions"); JA 48 (Wildeman Dec. ¶ 9) ("At no time did Checchia revoke his consent to the Terms and Conditions or otherwise indicate he did not agree to be bound by the Terms and Conditions").

Checchia failed to put forth any evidence rebutting SoLo's claim. *See generally* Dkt. 12 (Response); Dkt. 14 (Sur-Reply). Checchia did not state he did not see the Terms. *See* JA 49 (Checchia Dec.). Checchia did not state he was unaware the hyperlinks were hyperlinks. *Id.* Checchia did not state he was confused by the naming convention used for the hyperlink and "I agree" button. *Id.* Checchia did not explain what he thought he was agreeing to when he checked the box next to "I agree to SoLo's Terms & Conditions," if not the Terms. *Id.* Checchia did not provide evidence in support of his unconscionability arguments.[9] *Id.* It was not until his sur-reply that Checchia provided any evidence in relation to the Motion to Compel, and it was equal parts untimely and ineffective. *See id.* Checchia merely asserted that he does not remember seeing, reading, being presented, or agreeing to the Terms. *Id.* However, a self-serving affidavit that states nothing more than a lack of memory is

---

[9] These arguments are not before this Court because the District Court never reached the issue. JA 23-24 (Opinion) ("the Court does not address Checchia's remaining argument as to the delegation clause and unconscionability").

ineffective. *See Keating v. Pittston City*, 643 Fed. Appx. 219, 224-25 (3d Cir. 2016) (finding lack of memory does not create genuine dispute).

In addition, in the Reply SoLo presented evidence that Checchia was a sophisticated litigant and experienced user of online lending. *See* Dkt. 13 at 7, n. 16. The evidence presented was based on public records showing Checchia filed at least seven class actions that are or were in federal court:

(1) an action against Bank of America filed in Philadelphia County in 2021, removed, and then settled for $8,000,000 (Case 2:21-cv-03585 (E.D. Pa. Feb. 16, 2023));

(2) a data breach class action (Case 2:22-cv-03640 (E.D. Pa. Sep. 13, 2022));

(3) a TCPA class action (Case 2:22-cv-4241 (E.D. Pa. Oct. 20, 2022));

(4) a Video Privacy Protection Act class action (Case 1:22-cv-9239 (S.D.N.Y. Oct. 27, 2022)); and

(5) and (6) two class actions raising extremely similar allegations to the instant action in the Middle District of Pennsylvania (Case 3:22-cv-2077 (M.D. Pa. Dec. 30, 2022) and Case No. 3:22-cv-2078 (M.D. Pa. Dec. 30, 2022)); and

(7) this action.

Checchia also initiated an individual action under the Credit Repair Organizations Act and Pennsylvania's UTPCPL in the Central District of California

(Case No. 8:23-cv-311 (C.D. Cal. Feb. 22, 2023)). *Id*.  SoLo also presented public records evidence indicating Checchia is a member of two other online lending platforms, Dave and Earnin, one of which he had been a member of since 2017. *Id*.

The Court erred by not factoring these uncontested facts in its analysis. This information is highly relevant to Checchia's knowledge and understanding and supports the conclusion that he had knowledge of, and assented to, the Terms.

## D. <u>Subsequent Changes in Pennsylvania Law are Inapplicable on Appeal.</u>

During the lower court proceedings, the Parties agreed, and the District Court held, that there was no actual conflict between California and Pennsylvania law concerning the enforceability of Internet-based contracts, and as such, the Parties and the District Court cited to and relied upon law from both states interchangeably. *See, e.g.,* Dkt. 12 at 10, n. 4 ("Because Pennsylvania and California law both require mutual assent to form a contract, there is no conflict here") (Response); JA 14 (Opinion) ("the parties agree there is no actual conflict between the laws of California and Pennsylvania with respect to contract formation, rendering it unnecessary to do any choice of law analysis").

SoLo anticipates that Checchia may now attempt to argue that Pennsylvania law controls based on a recent, non-binding case from the Superior Court of Pennsylvania – *Chilutti v. Uber Technologies, Inc.,* 300 A.3d 430 (Pa. 2023) which

set forth a heightened standard for reviewing arbitration agreements. However, any reliance on *Chilutti* would be misplaced.

First, the Parties neither raised choice of law as an issue with the District Court, and as a result, the District Court did not reach the issue. Thus, any choice of law arguments have been waived and were not preserved for appeal. *See Williams v. BASF Catalysts LLC*, 765 F.3d 306, 316 (3d Cir. 2014) (holding that the parties had waived their right to seek application of another state's law where they did not litigate the choice of law issue before the district court or challenge the district court's use of a certain state's law to analyze their claims); *see also Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 776 n.16 (3d Cir. 2018) ("We assume that Pennsylvania law applies without undertaking a choice of law analysis, because both Smith & Nephew and the District Court assumed that Pennsylvania law applied to the claims in the Third Amended Complaint, and because the Shukers have waived any objection to that choice of law by failing to make it.").

Moreover, *Chilutti* turned on the conspicuousness of notice that a right to a jury trial was being waived in connection with an online agreement, and issue that was neither factually or legally developed, raised, or considered, in this action, further demonstrating it has not been preserved for appeal.

Second, *Chilutti* is not binding on this Court. *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657 (3d Cir. 1980) (holding that in the absence of a controlling

opinion from the state's highest court on an issue of state law, decisions of lower state courts should be accorded "proper regard" but not conclusive effect); *see also Pac. Employers Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 433 (3d Cir. 2012) (same).

Third, *Chilutti* is at odds with binding United States Supreme Court precedent and a petition is currently pending to have the Supreme Court of Pennsylvania review *Chilutti. See, e.g., Kindred Nursing Centers Ltd. P'ship v. Clark*, 581 U.S. 246, 252 (2017) (the FAA preempts a heightened "clear-statement rule" for waiving "the right to go to court and receive a jury trial" because such waiver is "the primary characteristic of an arbitration agreement").

Finally, if relied upon, *Chilutti* would represent a substantive change in the law of this case subsequent to the order on appeal, and the case must then be remanded to the District Court for a choice of law determination. *See Forestal Guarani SA v. Daros Intern., Inc.*, 613 F.3d 395, 401 (3d Cir. 2010) (remanding for analysis of choice-of-law considerations). A federal court exercising diversity jurisdiction "is bound to follow the law as decided by the highest court of the state even if it has changed during the pendency of the federal action." *Air Prod. & Chems., Inc. v. Hartford Acc. & Indem. Co.*, 25 F.3d 177, 181 (3d Cir. 1994). "Intervening and conflicting [state court] decisions will thus cause the reversal of judgments which were correct when entered." *Baker v. Outboard Marine Corp.*, 595

F.2d 176, 182 (3d Cir. 1979) (remanding case where the Supreme Court of Pennsylvania changed the applicable law after the appellate brief was filed but prior to argument before the Third Circuit). Accordingly, where there is a change in the law subsequent to the entry of the order on appeal, the case should be remanded for consideration of the impact, if any, of the intervening decision. *Allstate Ins. Co. v. Drumheller*, 115 Fed. Appx. 528, 529 (3d Cir. 2004).

As such, *Chilutti* is not controlling law in this case, and any reliance on the same by Checchia would necessitate remand to the District Court for further consideration of its impact, if any.

## E.    <u>The District Court Erred by Not Permitting Discovery and a Trial.</u>

9 U.S.C. § 4 "makes clear that 'if the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." *Hansen v. LMB Mortgage Services, Inc.*, 1 F. 4th 667, 672 (9th Cir. 2021); *see also Jin v. Parsons Corp.,* 966 F.3d 821, 823 (D.C. Cir. 2020) (if there is a genuine issue of material fact, district court must "hold the motion [to compel arbitration] in abeyance pending its prompt resolution of whether the parties agreed to arbitrate"); *Egan v. Live Nation Worldwide, Inc*., 764 F. App'x 204, 208 (3d Cir. 2019) ("District courts should decide motions to compel arbitration using a summary-judgment standard only when there is no genuine dispute of material fact. When there is such a dispute, the court should hold a trial to resolve

it."); *Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd*., 944 F.3d 225, 241 (4th Cir. 2019) (where disputes of material fact exist, the FAA "obliged the district court to conduct trial proceedings and thereby resolve those disputes before resolving the Arbitration Motion"); *Neb. Mach. Co. v. Cargotec Sols., LLC*, 762 F.3d 737, 744 (8th Cir. 2014) ("because issues of fact remained on the formation of the arbitration agreement, the district court erred in failing to summarily proceed to trial").

The need for the arbitration issue to be fully developed is particularly important where, as here, the Court would otherwise be ordering a CAFA class action to proceed based upon a thinly and inadequately developed record.

At a minimum, there was a triable issue of fact regarding whether Checchia had actual notice of the Terms. In addition, if this Court were to uphold the District Court's ultimate conclusion, which it should not, then there would be a triable issue on inquiry notice. Checchia did not submit any evidence denying having had knowledge of the Terms, that his relationship with SoLo was governed by the Terms, nor his understanding of and experience with the terms "Terms of Service" and "Terms and Conditions." For example, if Checchia is a sophisticated user of online lending (in accordance with the uncontroverted evidence SoLo presented in the Motion to Compel) and always encountered terms and conditions governing his relationships with online lenders and online lending platforms, this would support a finding of notice.

Similarly, if Checchia is a software developer, his ability to identify links and recognize common naming conventions may be enhanced further supporting notice. Checchia also secured nineteen loans through SoLo's platform, and the Terms are available on every page of SoLo's website and the Mobile App, so Checchia may have obtained actual knowledge during his active use of the Platform. *See* JA 44 (Muñoz Dec. ¶ 14); JA 46-48 (Wildeman Dec. ¶ 7).

At a minimum, a review of Checchia's browsing history for any visits to the Terms would be relevant. If his browsing history reveals he visited the Terms, that would be dispositive because he would then indisputably have actual knowledge. A plethora of other examples can be provided and all demonstrate why trial is required along with limited discovery. Despite SoLo requesting trial, the District Court denied the Motion to Compel without ordering a trial.[10] Dkt. 29, 31:15-32:8, 51:1-16 (Transcript).

## CONCLUSION

For the reasons set forth above, SoLo prays that the District Court's judgment be reversed and the matter sent to binding arbitration.

In the alternative, SoLo prays that the District Court's judgment be reversed and the matter remanded to the District Court for further proceedings. Although

---

[10] The District Court's Order is ambiguous as to whether a trial would be permitted. To ensure this issue is preserved in light of the ambiguity, SoLo raises it in this Brief.

SoLo contends there is no genuine issue of material fact because assent is established as a matter of law, in the event this Court upholds the District Court's decision on this point, there would be a genuine issue of material fact surrounding whether Checchia has actual or inquiry notice.

<div style="margin-left: 40%;">

Respectfully submitted,

s/ *Joseph A. Apatov*_____
Joseph A. Apatov (Admitted *pro hac*)
Florida Bar. No 93546
McGlinchey Stafford, PLLC
101 NE 3rd Avenue, Suite 1810
Fort Lauderdale, Florida 33301
(954) 356-2516
(954) 252-3808 (fax)
japatov@mcglinchey.com

and

s/ *Andrew K. Stutzman*_____
Andrew K. Stutzman  (PA ID No. 72922)
Christopher A. Reese (PA ID No. 308939)
Stradley Ronon Stevens & Young, LLP
2005 Market St., Suite 2600
Philadelphia, PA 19103
(215) 564-8000
(215) 564-8120 (fax)
astutzman@stradley.com
creese@stradley.com

***Counsel for Defendant-Appellant
SoLo Funds, Inc.***

</div>

## <u>COMBINED CERTIFICATIONS OF COUNSEL</u>

1.   <u>Bar Membership:</u> The undersigned certifies that Joseph A. Apatov, Christopher A. Reese, and Andrew K. Stutzman are members of the bar of this Court.

2.   <u>Word Count</u>: This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,996 words.

3.   <u>Typeface</u>:  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in size 14 Time New Roman font.

4.   <u>Identical Compliance of Briefs</u>:  The undersigned certifies that the text of the brief filed electronically is identical to the text in the paper copies of the brief.

5.   <u>Virus Check</u>:  The undersigned certifies that virus detection was run on the electronic file containing the brief and the program detected no virus.

<div align="center">
<i>s/ Joseph A. Apatov</i><br>
Joseph A. Apatov<br>
Attorney for Appellant, SoLo Funds, Inc.
</div>

<div align="center">
Dated: <u>12/6/2023</u>
</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system on December 6, 2023. I certify that all participants in the case will be served via the appellate CM/ECF system and United States First Class Mail, Postage Prepaid on this 6th day of December, 2023, upon the following:

Kevin J. Abramowicz
Kevin Tucker
Chandler Steiger
Stephanie Moore
East End Trial Group LLC
6901 Lynn Way Suite 215
Pittsburgh, PA 15208
kabramowicz@eastendtrialgroup.com
ktucker@eastendtrialgroup.com
csteiger@eastendtrialgroup.com
smoore@eastendtrialgroup.com

<div align="center">

s/ <i>Joseph A. Apatov</i>
Joseph A. Apatov

</div>

No. 23-2193
# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

STEVEN CHECCHIA, INDIVIDUALLY AND AS A
REPRESENTATIVE OF THE CLASS,
*Plaintiff-Appellee,*

v.

SOLO FUNDS, INC.
*Defendant-Appellant.*

On Appeal from an Order and Memorandum Opinion Dated June 7, 2023
Denying, SoLo Fund, Inc.'s Motion to Compel Arbitration
in the United States District Court for the
Eastern District of Pennsylvania,
No. 2:23-cv-00444

## JOINT APPENDIX VOLUME I OF II
## JOINT APPX 1-27

Joseph A. Apatov
McGlinchey Stafford
101 NE 3rd Avenue, Suite 1810
Fort Lauderdale, Florida 33301
(954) 356-2516
(954) 252-3808 (fax)
japatov@mcglinchey.com
Admitted *pro hac*

Andrew K. Stutzman
Christopher A. Reese
Stradley Ronon Stevens & Young, LLP
2005 Market St., Suite 2600
Philadelphia, PA 19103
(215) 564-8000
(215) 564-8120 (fax)
astutzman@stradley.com
creese@stradley.com

*Counsel for SoLo, Funds, Inc., Defendant-Appellant*

# APPENDIX TABLE OF CONTENTS

## VOLUME I OF II

| **Document** | **Date** | **ECF** | **Page** |
|---|---|---|---|
| District Court's Memorandum | 06/07/23 | 21 | 1-24 |
| District Court's Order | 06/07/23 | 22 | 25 |
| Notice of Appeal | 07/05/23 | 25 | 26-27 |

## VOLUME II OF II

| **Document** | **Date** | **ECF** | **Page** |
|---|---|---|---|
| Screenshots of Final Page of Sign-up | 03/08/23 | 8-1 | 28-29 |
| The Terms | 03/08/23 | 8-1 | 30-36 |
| February 28, 2022 Loan Agreement | 03/08/23 | 8-2 | 37-38 |
| December 30, 2022 Loan Agreement | 03/08/23 | 8-2 | 39-40 |
| Declaration of Eddy Muñoz | 03/08/23 | 8-1 | 41-44 |
| Declaration of Albert Wildeman | 03/08/23 | 8-2 | 45-48 |
| Declaration of Steven Checchia | 04/24/23 | 14-1 | 49 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **STEVEN CHECCHIA**, | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 23-444-KSM** |
| **SOLO FUNDS**, | |
| Defendant. | |

## <u>MEMORANDUM</u>

**MARSTON, J.**                                                    **June 7, 2023**

Plaintiff Steven Checchia, individually and on behalf of a putative class, sued Defendant Solo Funds Inc. ("SoLo") for violations of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), the Loan Interest and Protection Law, and the Consumer Discount Company Act in the Philadelphia County Court of Common Pleas.  (Doc. No. 1, Ex. A ("Compl.").)  SoLo removed the case to this Court (*see* Doc. No. 1) and has moved to compel Checchia to arbitrate his claims, arguing that when Checchia created his SoLo account, he agreed to SoLo's Terms and Conditions, which contained an arbitration provision (Doc. No. 8).  Checchia opposes the motion, contending that SoLo cannot prove that a valid agreement to arbitrate exists and that even if such an agreement did exist, the arbitration provision is unenforceable.  (Doc. No. 12.) The Court held oral argument on May 23, 2023.

For the reasons discussed below, the Court denies SoLo's motion.

## I.    Background: The Complaint

The following facts are taken from Checchia's Complaint.

### A.  SoLo's Business Model

SoLo[1]  owns and operates a lending mobile application called "SoLo."[2]   (Compl. at ¶ 9; *see also id.* at ¶ 8 (SoLo "makes loans or advances to Pennsylvania consumers over the internet").)  The application "connect[s] investors who wish to fund advances to consumers who wish to obtain advances."  (*Id.* at ¶ 10.)  "To obtain an advance through the [SoLo] app, consumers enter the amount they seek and the term to repay that amount," and "are then asked if they wish to pay money to obtain their advance."  (*Id.* at ¶¶ 15–16.)  "Specifically, consumers are asked if they wish to 'tip' the investor that funds their advance, and if they wish to 'donate' to [SoLo] for issuing their advance."  (*Id.* at ¶ 17.)

SoLo recommends that consumers pay 12% of their advance to the investor (a "tip") and 9% to SoLo (a "donation").  (*See id.* at ¶¶ 17–18.)  "Although consumers can theoretically obtain an advance without paying money, in practice, consumers cannot obtain an advance through the [SoLo] app without agreeing to pay money to obtain the advance."  (*Id.* at ¶ 19.)  "The 'tips' and 'donations' consumers must pay to obtain their advance are costly."  (*Id.* at ¶ 21.)  SoLo also obtains other fees from the consumers who have received advances, such as recovery fees, late fees, administrative fees, and synapse transaction fees.  (*See id.* at ¶¶ 36, 39–40.)

Ultimately, Checchia claims that SoLo "misrepresents that its advances cost nothing" to consumers.  (*Id.* at ¶ 24; *see also id.* at ¶¶ 25–26 (alleging that SoLo's promissory note and Truth-in-Lending Act ("TILA") disclosures include "false" representations, since they state that

---

[1] SoLo is a technology company, not a bank.  (Compl. at ¶¶ 6–8.)

[2] According to SoLo's Director of Product, Eddy Muñoz, "SoLo provides an online platform that connects third-parties seeking to borrow money (called 'Borrowers') with third-parties offering to lend money (called 'Lenders')."  (Muñoz Aff. at ¶ 3.)  This platform is accessible online on SoLo's website and via the Mobile Application.  (*Id.*)

a consumer's advance has a $0.00 Finance Charge and a 0% annual percentage rate ("APR")

when in actuality "the advances issued through the [SoLo] app have significant costs"); *id.* at

¶ 60 ("The advances [SoLo] issues through the [SoLo] app are payday loans, which have been

repackaged in a user-friendly app, which are deceptively rebranded as no-cost advances, and

which [SoLo] falsely and misleadingly represents as having 0% APRs."); *id.* at ¶¶ 68–69.)

Checchia pleads that SoLo's "business takes advantage of consumers' lack of awareness of how

[SoLo's] fees add up to make the advances facilitated through the [SoLo] app difficult to repay

and more costly than other forms of credit." (*Id.* at ¶ 71.)

### B. *Checchia Obtains Advances Through SoLo's Mobile Application*

Checchia "obtained various cash advances through the [SoLo] app" for "personal, family,

and/or household purposes." (*Id.* at ¶¶ 76–77.)  In doing so, Checchia has paid for "tips" and

"donations." (*Id.* at ¶ 78.)  "Each time Checchia paid a 'tip' and/or 'donation,' the charges he

paid, in the aggregate, exceeded 6%." (*Id.* at ¶ 79.)  By way of example, on October 21, 2022,

Checchia obtained a $450 cash advance; he paid a $31.50 "donation" to SoLo and a $40 tip to

the investor. (*Id.* at ¶ 80.)  "The cash advance was to be repaid in two weeks, yielding a

414.25% APR," notwithstanding SoLo's representation that the advance at issue had a $0.00

Finance Charge and a 0% APR. (*Id.* at ¶¶ 81–82.)  Checchia alleges that he was unaware of the

costs associated with SoLo's cash advances and that he has since stopped using the SoLo app.

(*Id.* at ¶¶ 84–85.)

## II.    Background: Motion to Compel

Along with its motion to compel, SoLo filed affidavits by Eddy Muñoz, SoLo's Director

of Product, and Albert Wildeman, SoLo's Vice President of Data Analytics. (*See* Doc. Nos. 8-1,

8-2.)  SoLo also attached to its motion copies of the SoLo sign-up page and its Terms. (*See* Doc.

No. 8-1, Exs. A & B.)  The Court sets forth the relevant facts from those documents below.

### A.  *Checchia's Loans*

Checchia created his SoLo account (the "Checchia Account") on February 26, 2022. (Muñoz Aff. at ¶ 7; Wildeman Aff. at ¶ 6.)  Checchia signed up for the Checchia Account through SoLo's Mobile Application.  (Muñoz Aff. at ¶ 7.)

Between February 28, 2022 and the end of 2022, Checchia contracted for 19 loans through SoLo's Platform, for a combined total amount of $6,175 (the "Loans").  (Wildeman Aff. at ¶ 7.)  Checchia paid back all but one of the Loans.  (*See id.*)  The timeline of the Loans is outlined as follows:

1. On February 28, 2022, a loan in the amount of $100 was funded by a Lender. Checchia paid back the loan on March 11, 2022.

2. On March 26, 2022, a loan in the amount of $150 was funded by a Lender.  Checchia paid back the loan on April 8, 2022.

3. On April 10, 2022, a loan in the amount of $50 was funded by a Lender.  Checchia paid back the loan on April 22, 2022.

4. On April 23, 2022, a loan in the amount of $225 was funded by a Lender.  Checchia paid back the loan on May 6, 2022.

5. On May 7, 2022, a loan in the amount of $300 was funded by a Lender.  Checchia paid back the loan on May 20, 2022.

6. On May 21, 2022, a loan in the amount of $375 was funded by a Lender.  Checchia paid back the loan on June 3, 2022.

7. On June 4, 2022, a loan in the amount of $400 was funded by a Lender.  Checchia paid back the loan on June 17, 2022.

8. On June 18, 2022, a loan in the amount of $200 was funded by a Lender.  Checchia paid back the loan on July 1, 2022.

9. On July 1, 2022, a loan in the amount of $500 was funded by a Lender.  Checchia paid back the loan on July 15, 2022.

10. On July 21, 2022, a loan in the amount of $325 was funded by a Lender.  Checchia

paid back the loan on July 29, 2022.

11. On July 29, 2022, a loan in the amount of $500 was funded by a Lender.  Checchia
    paid back the loan on August 12, 2022.

12. On August 17, 2022, a loan in the amount of $450 was funded by a Lender.  Checchia
    paid back the loan on August 26, 2022.

13. On August 31, 2022, a loan in the amount of $325 was funded by a Lender.  Checchia
    paid back the loan on September 9, 2022.

14. On September 9, 2022, a loan in the amount of $350 was funded by a Lender.
    Checchia paid back the loan on September 23, 2022.

15. On September 23, 2022, a loan in the amount of $500 was funded by a Lender.
    Checchia paid back the loan on October 7, 2022.

16. On October 7, 2022, a loan in the amount of $425 was funded by a Lender.  Checchia
    paid back the loan on October 21, 2022.

17. On October 21, 2022, a loan in the amount of $450 was funded by a Lender.
    Checchia paid back the loan on November 18, 2022.

18. On November 22, 2022, a loan in the amount of $200 was funded by a Lender.
    Checchia paid back the loan on December 16, 2022.

19. On December 30, 2022, a loan in the amount of $50 was funded by a Lender.
    Checchia has not paid back the loan.

(*Id.*)  Each of the Loans has a corresponding Loan Agreement and Promissory Note.  (*Id.* at ¶ 8.)

These reference SoLo's Terms and Conditions in the section titled "Default."  (*Id.*)  (*See, e.g.*,

Doc. No. 8-2, Ex. A at 7 (the executed February 28, 2022 Loan Agreement and Promissory Note,

which states: "Borrower may be deemed in default (each, an 'Event of Default') of Borrower's

obligations under this Note if Borrower . . . (4) fails to abide by the terms of this Note or the

SoLo Terms and Conditions").)

### B.  *SoLo's Terms and Conditions*

#### 1.  <u>Overview</u>

"[N]o user [can] lend or borrow money via SoLo's Platform without first creating an

account, which require[s] acceptance of the then-current version of SoLo's Terms and Conditions."  (Muñoz Aff. at ¶ 8.)

"To sign-up for SoLo's Platform through the Mobile Application" (like Checchia did to create the Checchia Account), a user must navigate through "a series of screens" and "provide various pieces of information, including a telephone number and a one-time passcode."  (*Id.* at ¶ 9.)  The final page includes a heading called "Last Step!"  (*Id.* at ¶ 10.)  On this page, the user is required to enter their name, date of birth, e-mail address, physical address, and social security number.  (*Id.*; Doc. No. 8-1, Ex. A at 6–7.)

There are six hyperlinks located directly under where the user enters the aforementioned information, the first of which is entitled "Terms of Service" and enables the user to view the then-current version of SoLo's Terms and Conditions, which is entitled "Terms."  (Muñoz Aff. at ¶ 10; Doc. No. 8-1, Ex. A at 6–7.)  Directly beneath those six hyperlinks are two checkboxes. (Muñoz Aff. at ¶ 10; Doc. No. 8-1, Ex. A at 7.)  The first box states, "The SSN [social security number] I entered is my own," and the second box states, "I agree to SoLo's Terms & Conditions."  (Muñoz Aff. at ¶ 10; Doc. No. 8-1, Ex. A at 7.)  After checking both boxes, the user must click on the button that states "Looks Good, Let's Go" to complete the sign-up process and create a SoLo account.  (Muñoz Aff. at ¶ 10; Doc. No. 8-1, Ex. A at 7.)

A user cannot complete the sign-up process or create a SoLo account until both boxes are checked off.  (Muñoz Aff. at ¶ 10; *see also id.* at ¶ 11 ("Checchia necessarily checked the box stating 'I agree to SoLo's Terms & Conditions' since he completed the sign-up process.").)

SoLo periodically updates its Terms and Conditions.  (*Id.* at ¶ 13.)  After February 26, 2022, SoLo's Terms and Conditions were updated twice; once on March 17, 2022 and again on December 21, 2022.  (*Id.*)

> **2.  <u>Arbitration Provision</u>**

All three sets of SoLo's Terms referenced the arbitration provision in bold, capitalized letters in the beginning, before setting forth the individual provisions:

> **THIS AGREEMENT CONTAINS AN ARBITRATION PROVISION THAT AUTHORIZES EITHER PARTY TO ELECT MANDATORY AND BINDING ARBITRATION OF CERTAIN DISPUTES WHERE PERMTITED BY LAW.  THE TERMS OF THE ARBITRATION PROVISION ARE SET FORTH IN THE SECTION ENTITLED 'RESOLUTION OF DISPUTES BY ARBITRATION.'   PLEASE**

**READ THE ARBITRATION PROVISION CAREFULLY.**

(*See* Doc. No. 8-1, Ex. B at 9, Ex. C at 17, Ex. D at 26.)   The arbitration provision itself stated:

> *DISPUTE RESOLUTION*.  IF YOU RESIDE IN THE UNITED STATES, UNLESS OTHERWISE SPECIFIED BY APPLICABLE LAW, YOU AGREE THAT ANY DISPUTE, CLAIM, OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY ALLEGED BREACH, TERMINATION, ENFORCEMENT, OR INTERPRETATION THEREOF, INCLUDING STATUTORY CONSUMER CLAIMS, OR TO THE USE OF THE SERVICE (TOGETHER, '**DISPUTES**') WILL BE SETTLED BY BINDING ARBITRATION, EXCEPT THAT EACH PARTY RETAINS THE RIGHT TO SEEK INJUNCTIVE OR OTHER EQUITABLE RELIEF IN A COURT OF COMPETENT JURISDICTION TO PREVENT THE ACTUAL OR THREATENED INFRINGEMENT, MISAPPROPRIATION, OR VIOLATION OF A PARTY'S COPYRIGHTS, TRADEMARKS, TRADE SECRETS, PATENTS, OR OTHER INTELLECTUAL PROPERTY RIGHTS.   YOU ACKNOWLEDGE AND AGREE THAT YOU ARE WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE AS A PLAINTIFF OR CLASS MEMBER IN ANY PROCEEDING.  UNLESS BOTH YOU PARTIES OTHERWISE AGREE IN WRITING, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF ANY CLASS OR REPRESENTATIVE PROCEEDING.
>
> ANY SUCH ARBITRATION SHALL BE INTIATED AND HELD IN THE OFFICE OF THE AAA IN LOS ANGELES, CALIFORNIA. JUDGMENT ON THE ARBITRATION AWARD MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF.
>
> NOTE THAT THIS AGREEMENT TO ARBITRATE CONSTITUTES A TRANSACTION IN INTERSTATE COMMERCE RENDERING THE INTERPRETATION AND ENFORCEMENT OF THIS PROVISION SUBJECT TO THE FEDERAL ARBITRATION ACT.   THIS ARBITRATOIN WILL BE ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION ('**AAA**') UNDER THE COMMERCIAL ARBITRATION RULES AND THE SUPPLEMENTARY PROCEDURES FOR CONSUMER RELATED DISPUTES (THE '**AAA RULES**') THEN IN EFFECT, EXCEPT AS MODIFIED BY THIS SECTION THE AAA RULES ARE AVAILABLE AT www.adr.org/arb_med OR BY CALLING THE AAA AT 1-800-788-7879.
>
> EACH PARTY SHALL BEAR ITS OWN COSTS AND FEES FOR

> EXPERTS AND ATTORNEYS.  THIS EXCLUSIVE ARBITRATION
> REMEDY SHALL NOT BE AVAILABLE UNLESS INTIATED WITHIN
> ONE YEAR AFTER THE DISPUTE AROSE.  THIS SECTION WILL
> SURVIVE ANY TERMINATION OF THIS AGREEMENT.

(Doc. No. 8-1, Ex. B at 13–14; *see also* Doc. No. 8-1, Ex. Ex. C at 21–22 (same, with the only

difference being that the AAA website is listed as www.adr.og), Ex. D at 35–36 (same, with the

only difference being that the AAA website is listed as www.adr.og).)

## III.    Standard of Review

When deciding a motion to compel arbitration, a court must first determine the applicable

standard of review:  the motion to dismiss standard under Federal Rule of Civil Procedure

12(b)(6) or the summary judgment standard under Federal Rule of Civil Procedure 56.  *See Silfee*

*v. Automatic Data Processing, Inc.*, 696 F. App'x 576, 578 (3d Cir. 2017); *Guidotti v. Legal*

*Helpers Debt Resol., LLC*, 716 F.3d 764, 772 (3d Cir. 2013).  "When it is apparent, based on the

face of a complaint, and documents relied upon in the complaint, that certain of a party's claims

are subject to an enforceable arbitration clause, a motion to compel arbitration should be

considered under a Rule 12(b)(6) standard without discovery's delay."  *Guidotti*, 716 F.3d at

776.  On the other hand, "if the complaint and its supporting documents are unclear regarding the

agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with

additional facts sufficient to place the agreement to arbitrate in issue, then the parties should be

entitled to discovery on the question of arbitrability," after which the court should consider the

motion under the Rule 56 summary judgment standard.  *Id.*; *see also Healthplan CRM, LLC v.*

*AvMed, Inc.*, 458 F. Supp. 3d 308, 316 (W.D. Pa. 2020) (If "the opposing party has come forth

with reliable evidence that is more than a naked assertion . . . that it did not intend to be bound by

the arbitration agreement, even though on the face of the pleadings it appears that it did, then

resort to discovery and Rule 56 is proper." (cleaned up)).  "In the event that summary judgment

is not warranted because the party opposing arbitration can demonstrate . . . that there is a genuine dispute as to the enforceability of the arbitration clause, the court may then proceed summarily to a trial regarding the making of the arbitration agreement or the failure, neglect, or refusal to perform the same, as Section 4 of the FAA [Federal Arbitration Act] envisions." *Guidotti*, 716 F.3d at 776 (cleaned up).

Checchia argues that the summary judgment standard applies. (*See* Doc. No. 12 at 9 ("Here, the summary judgment standard applies because it is not apparent from the face of the complaint, that Plaintiff's claims are subject to arbitration, as Plaintiff disputes that a valid and enforceable arbitration agreement was formed.").) SoLo never states whether it believes the Rule 12(b)(6) or Rule 56 standard apply in its briefing. (*See* Doc. Nos. 8, 13.) But at oral argument, SoLo indicated that the motion to dismiss standard should apply. (May 23, 2023 Draft Hr'g Tr. at 8:2–22.)

Here, the Court concludes that the Rule 12(b)(6) standard governs because SoLo attached its Terms, which included an arbitration provision, to its motion to compel arbitration, as well as an affidavit explaining that a user must check off a box agreeing to the Terms and Conditions before creating a SoLo account, and Checchia failed to respond with additional *facts* sufficient to place the arbitration provision in issue. *See Zabokritsky v. JetSmarter, Inc.*, Civil Action No. 19-273, 2019 WL 2563738, at *2 (E.D. Pa. June 20, 2019) ("Where the plaintiff fails to respond to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, the motion is considered under a Rule 12(b)(6) standard." (cleaned up)); *see also Parker v. Briad Wenco, LLC*, Civil Action No. 18-04860, 2019 WL 2521537, at *2 (E.D. Pa. May 14, 2019) ("If a party attaches an authentic arbitration agreement to a Motion to Compel arbitration, the Court must apply the Rule 12(b)(6) standard unless the plaintiff responds to a motion to

compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue."
(cleaned up)). *Cf. HealthplanCRM, LLC*, 458 F. Supp. 3d at 317 (applying Rule 12(b)(6)
standard where the party opposing the motion to compel had "not presented evidence or
otherwise identified any relevant category of information outside the record requiring the Court
to pierce the pleadings in order to determine whether a valid arbitration agreement exist[ed]").

In his sur-reply, Checchia provided a bare-bones declaration that merely states that he did
not recall either agreeing to the Terms or "seeing, reading, or being presented the Terms."  (Doc.
No. 14-1.)  Checchia'a failure to recall whether he agreed to or was presented with and read the
Terms is insufficient to place the arbitration provision in issue and trigger additional discovery.
*Cf. Matthews v. Gucci*, Civil Action No. 21-434, 2022 WL 462406, at *4 (E.D. Pa. Feb. 15,
2022) ("Matthews did not provide an affidavit stating that she did not receive the MAA or that
she did not sign the agreement.  Rather, during oral argument, her counsel merely argued that
Matthews did not recall whether she signed the MAA.  But the inability of a nonmoving party to
recollect whether she signed the agreement is insufficient to trigger additional discovery and the
Rule 56 standard in and of itself.").  Moreover, Checchia never asks for additional discovery.

Further, Checchia's contention that a valid and enforceable arbitration agreement was not
formed—and therefore the summary judgment standard applies (*see* Doc. No. 12 at 9)—is legal
argument, not fact-based.  Whether a valid arbitration agreement exists here turns on a question
of contract formation law.  Checchia does not dispute the facts set forth in SoLo's motion and
affidavits, but rather disagrees with SoLo over how the Court should interpret those facts.  (*See,
e.g.*, Doc. No. 12 at 12 (not disputing that Plaintiff clicked a box that stated, "I agree to SoLo's
Terms & Conditions" but rather arguing that because those "words were not hyperlinked to the
Terms" themselves and because the hyperlink provided referred to "Terms of Service" instead of

"Terms and Conditions," Plaintiff "did not unambiguously manifest his assent to the Terms"); *id.*

at 11 & n.8 (admitting that the mobile app included a "Terms of Service" hyperlink but arguing

that Plaintiff lacked notice of, and therefore did not assent to, the Terms because he was not

asked whether he read the Terms or whether he had read and understood the Terms); May 23,

2023 Draft Hr'g Tr. at 27:7–10 ("The Court: Well, but, your client did click on the box that says,

'I accept the terms.' Mr. Abramowicz: Correct.").)

 "The test in reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6)

is whether, under any 'plausible' reading of the pleadings, the plaintiff would be entitled to

relief." *Guidotti*, 716 F.3d at 772. "[I]f, accepting all factual allegations as true and construing

the complaint in the light most favorable to the plaintiff, we determine that the plaintiff is not

entitled to relief under any reasonable reading of the complaint," then a complaint should be

dismissed under Rule 12(b)(6).[3] *Id.*; *see also id.* at 777 ("Under the Rule 12(b)(6) standard,

there would be no reading of the complaint, no matter how friendly to [the plaintiff], that could

rightly relieve her of the arbitration provision in the Account Agreement[.]").

## IV. Discussion

 "Because arbitration is a matter of contract, before compelling arbitration pursuant to the

[FAA], a court must determine that (1) a valid agreement to arbitrate exists, and (2) the particular

dispute falls within the scope of that valid agreement." *Kirleis v. Dickie, McCamey & Chilcote,*

*P.C.*, 560 F.3d 156, 160 (3d Cir. 2009); *see also Dicent v. Kaplan Univ.*, 758 F. App'x 311, 313

(3d Cir. 2019). "To determine if there is a valid arbitration agreement, a court must 'apply

ordinary state-law principles that govern the formation of contracts.'" *Hrapczynski v.*

---

[3] Even if the Court were to apply the Rule 56 standard, the end result (i.e., denial of this motion) would be
the same. Plaintiffs' counsel reiterated during oral argument that he did not need discovery. (*See* May
23, 2023 Draft Hr'g Tr. at 29:7–9 ("[The Court]: Are you asking for discovery? Mr. Abramowicz: No,
we are not.").)

*Bristlecone, Inc.*, Civil Action No. 20-cv-06014, 2021 WL 3209852, at *3 (E.D. Pa. July 29, 2021) (quoting *James v. Glob. TelLink Corp*, 852 F.3d 262, 265 (3d Cir. 2017).

A choice of law analysis is necessary to determine whether Pennsylvania or California law applies.[4]  This is a diversity case, so the Court applies the choice of law rules of the forum state, Pennsylvania.  *Amica Mut. Ins. Co. v. Fogel*, 656 F.3d 167, 171 (3d Cir. 2011) ("In an action based on diversity of citizenship, a federal court generally applies the choice-of-law rules of the jurisdiction in which it sits."); *see also Hrapczynski*, 2021 WL 3209852, at *4.

The Third Circuit has described Pennsylvania's choice of law analysis as containing three steps.  First, we must determine whether there is an actual conflict between the laws of the relevant states.  *See Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007) ("[T]he first part of the choice of law inquiry is best understood as determining if there is an actual or real conflict between the potentially applicable laws."). "If two jurisdictions' laws are the same, then there is no conflict at all, and a choice of law analysis is unnecessary."  *See id.*; *see also Budtel Assoc., L.P. v. Cont'l Cas. Co.*, 915 A.2d 640, 641 (Pa. Super. Ct. 2006) ("If no conflict exists, further analysis is unnecessary.  If a conflict is found, it must be determined which state has the greater interest in the application of its law.").  "Second, if there is a conflict in the law, then a court should examine the governmental policies underlying each law, and classify the conflict as a 'true,' 'false,' or an 'unprovided-for' situation."  *Hrapczynski*, 2021 WL 3209852, at *4 (internal quotation marks and citations omitted).  "Third, if a true conflict exists, the Court must then determine which state has the greater interest in the application of its law."  *Id.* (cleaned up).

---

[4] SoLo is located in California, and Checchia lives in Pennsylvania. (Compl. at ¶¶ 5–6.) The Court notes that all three sets of SoLo's Terms and Conditions contained a governing law provision, which states that the "Agreement is governed by California law without regard to its conflicts of law rules[.]"  (*See* Doc. No. 8-1, Ex. B at 13, Ex. C at 21, Ex. D at 34.)

Here, the parties agree that there is no actual conflict between the laws of California and Pennsylvania with respect to contract formation, rendering it unnecessary to do any choice of law analysis.  (*See* Doc. No. 8 at 19 ("[T]he Arbitration Agreement is enforceable regardless of whether California or Pennsylvania law applies."); Doc. No. 12 at 10 n.4 ("These rules require avoiding the choice of law question if the laws at issue produce the same result.  Because Pennsylvania and California law both require mutual assent to form a contract, there is no conflict here." (cleaned up); May 23, 2023 Draft Hr'g Tr. at 11:20–21 ("[B]ecause the fundamental principals [sic] are the same, I don't think there is a conflict that impacts the issue.").)  *See also Hrapczynski*, 2021 WL 3209852, at *4 ("The parties concede that there is no 'actual' conflict between the laws of California and Pennsylvania regarding contract formation.  As Bristlecone states, 'whether Pennsylvania or California law applies, *the result is the same*.  Hrapczynski also recognizes, 'there is no conflict between Pennsylvania and California law on the issue of contract formation – the analyses proceed identically.'  Thus, it is unnecessary to do any further choice of law analysis.").  *Cf. Azer Scientific Inc. v. Quidel Corp.*, Civil No. 5:21-cv-02972-JMG, 2021 WL 5918655, at *4 n.2 (E.D. Pa. Dec. 15, 2021) ("Before a choice of law question arises, there must actually be a conflict between the potentially applicable bodies of law.  Where there is no conflict, the court should avoid the choice of law issue.  Here, the Court finds no conflict between Pennsylvania and California law regarding contract formation.  Accordingly, we need not resolve the conflict-of-law issue." (cleaned up)).

Because the parties agree that there is no actual conflict, the Court will apply Pennsylvania and California law interchangeably.  *See Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006) ("Before a choice of law question arises, there must first be a true conflict between the potentially applicable bodies of law.  If there is no conflict, then the district court sitting in

diversity may refer interchangeably to the laws of the states whose laws potentially apply.");

*Philidor Rx Servs. LLC v. Polsinelli PC*, 552 F. Supp. 3d 506, 512 n.4 (E.D. Pa. 2021)

("Pennsylvania choice of law rules first ask if there is an 'actual conflict' between the laws of the

two states.  When there is no conflict, cases can be cited interchangeably or Pennsylvania law

may be applied."  (cleaned up)).

* * *

The Court now considers whether a valid agreement to arbitrate exists.  To form a

contract under both California and Pennsylvania law, the parties must manifest mutual assent.

*See Snow v. Eventbrite, Inc.*, Case No. 3:20-cv-03698-WHO, 2021 WL 3931995, at *2 (N.D.

Cal. Sept. 2, 2021) ("Under California law, a valid contract requires the mutual consent of the

parties[.]"); *Zabokritsky*, 2019 WL 2563738, at *3 ("Under Pennsylvania law, the elements of an

agreement are: (1) both parties must manifest an intention to be bound by the agreement; (2) the

terms of the agreement must be sufficiently definite; and (3) there must be consideration." (citing

*Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002)).  An Internet-based agreement

to arbitrate is enforceable where (1) notice of the agreement is reasonably conspicuous and (2)

manifestation of assent is unambiguous.  *See Oberstein v. Live Nation Ent'mt, Inc.*, 60 F.4th 505,

515 (9th Cir. 2023) ("[A]n enforceable agreement may be found where '(1) the website provides

reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the

consumer takes some action, such as clicking a button or checking a box, that unambiguously

manifests his assent to those terms.'" (quoting *Berman v. Freedom Fin. Network*, 30 F.4th 849

(9th Cir. 2022))); *see also HealthplanCRM, LLC*, 458 F. Supp. 3d at 331 ("[T]he Court may

determine that a web-based agreement to arbitrate exists where notice of the agreement was

reasonably conspicuous and manifestation of assent unambiguous as a matter of law." (cleaned

up)).

There are two primary types of Internet-based contracts: "clickwrap" agreements and "browsewrap" agreements. *See, e.g.*, *Nguyen v. Barnes & Noble Inc.*, 736 F.3d 1171, 1175–76 (9th Cir. 2014). Clickwrap agreements arise when "a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed." *Oberstein*, 60 F.4th at 513 (cleaned up); *see also Snow*, 2021 WL 3931995, at *3 ("Clickwrap (or click-through) agreements require a website's users to click on an 'I agree' box after being presented with a list of terms and conditions of use." (cleaned up)). Courts routinely enforce clickwrap agreements. *Oberstein*, 60 F.4th at 513; *HealthplanCRM, LLC*, 458 F. Supp. 3d at 334; *see also Berman*, 30 F.4th at 856 ("In [the clickwrap] scenario, the consumer has received notice of the terms being offered, and in the words of the Restatement, knows or has reason to know that the other party may infer from his conduct that he assents to those terms. As a result, courts have routinely found clickwrap agreements enforceable." (cleaned up)); *Dobbs v. Health IQ Ins. Servs., Inc.*, Civil Action No. 21-5236, 2022 WL 2974713, at *4 (E.D. Pa. July 27, 2022) ("[C]ourts have held that 'clickwrap' agreements manifest sufficient agreement to the terms in the contract.").

In contrast, courts are "generally more reluctant to enforce browsewrap agreements," *Brooks v. IT Works Mktg., Inc.*, No. 1:21-cv-01341-DAD-BAK, 2022 WL 2079747, at *5 (E.D. Cal. June 9, 2022), in which "a website's terms and conditions of use are generally posted on a website via hyperlink at the bottom of the screen," *Lee v. Ticketmaster LLC*, 817 F. App'x 383, 394 (9th Cir. 2020) (quoting *Nguyen*, 763 F.3d at 1175–76); *see also HealthplanCRM, LLC*, 458 F. Supp. 3d at 331 ("In browsewrap agreements, a company's terms and conditions are generally posted on a website via hyperlink at the bottom of the screen. However, unlike online

agreements where users must click on an acceptance after being presented with terms and conditions (known as 'clickwrap' agreements), browsewrap agreements do not require users to manifestly express assent.").

Not all Internet-based contracts fall neatly into the "clickwrap" or "browsewrap" categories, however.  *See, e.g.*, *Oberstein*, 60 F.4th at 515 ("Appellees' Terms are not pure clickwrap because they do not, upon some user action, request that users click on a box to confirm agreement before proceeding.  Nor are they pure browsewrap, as they are not hidden in links located at the bottom of webpages.  Rather, they lie somewhere in between."); *Brooks*, 2022 WL 2079747, at *5 ("These two categories of Internet contracts fall on two ends of a spectrum . . . Often websites present some hybrid of the two, such as putting a link to the terms of the agreement on the page, sometimes near a button the user must click to continue." (cleaned up)); *see also Capps v. JPMorgan Chase Bank, N.A.*, No. 2:22-cv-00806-DAD-JDP, 2023 WL 3030990, at *4 (E.D. Cal. Apr. 21, 2023) ("[T]he Terms of Use Agreement is somewhat like a browsewrap agreement in that the terms are only visible via a hyperlink, but also somewhat like a clickwrap agreement in that the user must do something else—click 'Create Your Account'— to assent to the hyperlinked terms." (cleaned up)); *Williams v. DDR Media, LLC*, Case No. 22-cv-03789-SI, 2023 WL 2314868, at *3 (N.D. Cal. Feb. 28, 2023) ("The agreement here falls somewhere between a clickwrap and a browsewrap agreement.  A user is not required to click an 'I agree' button after being shown the website's Terms and Conditions, but the website does inform users that if they click a button (the 'Get Started' button), they agree to the Terms of Use."); *Regan v. Pinger, Inc.*, Case No. 20-CV-02221-LHK, 2021 WL 706465, at *5–6 (N.D. Cal. Feb. 23, 2021) (finding that the agreement was "somewhere between a pure clickwrap and a pure browsewrap agreement" where the users of the Sideline App were "not forced to actually

read the [Terms of Service] before assenting to them"—unlike a "pure-form clickwrap agreement, [where] users typically click an 'I agree' box after being presented with a list of terms and conditions of use"—and instead clicked buttons for actions like "Create Account," "For Personal Use," or "Login," which "did not explicitly reference the [Terms of Service] (cleaned up)).

SoLo maintains that the agreement between SoLo and Checchia is a clickwrap agreement because Checchia had to click a button stating "I agree to SoLo's Terms & Conditions" to proceed.  (*See* Doc. No. 8 at 20.)  As noted above, a clickwrap agreement exists when a user is presented with the contractual terms before having to affirmatively assent to those conditions—but it is not obvious that was the case here.  Even though Checchia did have to click the "I agree to SoLo's Terms & Conditions" button to create his SoLo account (and could not have accessed SoLo's product and/or services otherwise), there is no indication that the Terms were presented to Checchia beforehand, such as on a pop-up screen.  Moreover, the phrase "Terms & Conditions" was *not* hyperlinked, which distinguishes this case from others in which courts have found clickwrap agreements exist.[5]  *See, e.g.*, *Berman*, 30 F.4th at 856 ("The most straightforward application of these principles in the online world involves so-called 'clickwrap' agreements, in which a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed.").  *Contra Treinish v. iFit Inc.*, Case No. CV 22-4687-DMG (SKx), 2023 WL 2230431, at *2, *4 (C.D. Cal.

---

[5] SoLo's counsel admitted during oral argument that he was unable to find a case directly on point and that this case involves a unique fact pattern.  (*See* May 23, 2023 Hr'g Tr. at 14:6–12 ("I don't think any of the cases cited by plaintiffs – and frankly, I don't think I found any directly on point either – addressed the context of clicking something that says 'I agree to certain terms.'  There being a name mismatch.  It being linked but not being linked in the 'I agree' button.  So it's kind of a unique situation in that regard.").)

Feb. 2, 2023) (finding a clickwrap agreement existed because "[t]o create an iFIT account, the user must check a box next to the message: 'I have read and agree to iFIT's Terms of Use and Privacy Policy,' with 'Terms of Use' and 'Privacy Policy' written in blue, underscored, and hyperlinked text"); *Navarro v. SmileDirectClub, Inc.*, Case No. 22-cv-00095, 2022 WL 1786582, at *3–4 (N.D. Cal. June 1, 2022) (finding a clickwrap agreement existed because to create an account, the user had to check a box that said "I agree to SmileDirect Club's Informed Consent and Terms & SmilePay Conditions" where "Terms" and "SmilePay Conditions" were each blue hyperlinks); *Alfia v. Coinbase Global, Inc.*, Case No. 21-cv-08689-HSG, 2022 WL 3205036, at *2 (N.D. Cal. July 22, 2022) ("[T]o create his Coinbase-account, Plaintiff had to click a 'check box' next to the language 'I certify that I am 18 years of age or older, and I agree to the User Agreement and Privacy Policy,' with both agreements accessible via hyperlink . . . Plaintiff's assent was similar to a 'clickwrap' agreement—he clicked a box stating that he agreed to the User Agreement, which was hyperlinked for easy accessibility."); *Zabokritsky*, 2019 WL 2563738, at *3, *5 (finding a clickwrap agreement existed where the mobile app user had to slide a button "I agree to Terms of Use" and the words "Terms of Use" were a red hyperlink that led to the Terms of Service); *Gambo v. Lyft, Inc*., -- F. Supp. 3d --, Civil Action No. 22-1726 (RDM), 2022 WL 16961132, at *1 (D.D.C. Nov. 16, 2022) (finding a clickwrap agreement existed where the "user was required to click on a box representing that he understood and agreed to the Terms of Service, and those Terms of Service were accessible by merely clicking on the highlighted [hyper]link appearing in that same sentence").  For these reasons, the Court finds that the agreement here also "lie[s] somewhere in between" a clickwrap and browsewrap agreement.  *Oberstein*, 60 F.4th at 515.

 Next, the Court considers whether Checchia had notice of, and manifested assent to,

SoLo's Terms.  Because SoLo has not provided any proof that Checchia had actual notice of SoLo's Terms, the Court considers only whether Checchia had constructive, or inquiry, notice of the Terms.  This requires us to determine whether the notice was reasonably conspicuous.  *See Berman*, 30 F.4th at 856 ("Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be found; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms."); *Brooks*, 2022 WL 2079747, at *6 ("[D]efendants have not shown that plaintiff had actual notice of the Terms of Use and can proceed only on an inquiry or constructive notice theory of contract formation . . . To establish that plaintiff had inquiry notice of the Terms of Use, defendants must first show that the It Works! Website 'provides reasonably conspicuous notice of the terms to which the consumer will be bound.'" (citation omitted)).  To be reasonably conspicuous, "a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Berman*, 30 F.4th at 856.  Moreover, "while it is permissible to disclose terms and conditions in a hyperlink, the fact that a hyperlink is present must be readily apparent." *Id.* at 857.  Neither of those requirements is met here.

As noted above, before being able to click "Looks Good, Let's Go" and proceed with creating an account, a SoLo user must click a button that says "I agree to SoLo's Terms & Conditions."  (*See* Doc. No. 8-1 at 7.)  Significantly, "Terms & Conditions" is *not* hyperlinked to the Terms, nor does it appear in any special color, font, or format.  (*See id.*)  Further, "Terms of Service" (which SoLo avers is hyperlinked and leads to its Terms) appears about seven lines above the "I agree" checkbox.  (*See id.*)  In other words, the actual hyperlinked "Terms of

Service" is not in close proximity to the "I agree" checkbox.

In addition, "Terms of Service" appears in a blueish-green color and is not underlined or capitalized.  (*See id.*)  It is also the same exact font size and color as the five lines that appear directly beneath it, which include: "Privacy Policy," "E-Sign Disclosure," "SynapseFi's Terms of Service," "SynapseFi's Privacy Policy," and "Evolve's Deposit Agreement."  (*See id.*)  It is also approximately the same font size as the "The SSN I entered is my own" and "I agree to SoLo's Terms & Conditions" checkboxes that follow.  (*See id.*)

Ultimately, "Terms of Service" is devoid of features to set it apart from the surrounding text; as noted, it lacks the traditional indicia of hyperlinks, such as underlines and capitalization, and it is the same color as the text that immediately follows it for the next five lines.  *Cf. Berman*, 30 F.4th at 847 ("A web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently 'set apart' from the surrounding text.  Customary design elements denoting the existence of a hyperlink include the use of contrasting color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage."). "Consumers cannot be required to hover their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to 'ferret out hyperlinks.'"  *Id.* (citation omitted).

And, critically, there is nothing indicating that the "Terms of Service" are in fact "SoLo'sTerms & Conditions" to which the user is agreeing when clicking the "I agree" checkbox.[6]  Again, they were not situated near one another; the "Terms of Service" hyperlink did

---

[6] During oral argument, SoLo's counsel cited to *Meyer v. Uber Tech., Inc.*, 868 F.3d 66 (2d Cir. 2017) to support its position that the terms "Terms of Service" and "Terms & Conditions" are interchangeable. (May 23, 2023 Draft Hr'g Tr. at 6:22–11.)  But *Meyer* is distinguishable because, in that case, the Terms of Service was hyperlinked to the Terms and Conditions.  *See id.* at 78 (finding notice was reasonably conspicuous in a mobile app where there was a warning by the registration button that stated, "By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY" and the text,

not appear immediately above or below the "I agree" checkbox. And to heighten the confusion, the "Terms of Service" hyperlink had no identifier (i.e., was not labeled as "SoLo's Terms of Service") and was not even the only "Terms of Service" that appeared on the page; indeed, "SynapseFi's Terms of Service" was also located a few lines above the "I agree" checkbox.

For these reasons, the Court concludes that notice was not reasonably conspicuous and that Checchia did not manifest assent to the arbitration agreement. *Contra Oberstein*, 60 F.4th 516 ("We agree with the district court that a reasonable user would have seen the notice and been able to locate the Terms via hyperlink. Appellees' notice is conspicuously displayed directly above or below the action button at each of three independent stages that a user must complete before purchasing tickets. The language 'By continuing past this page and clicking [the button], you agree to our Terms of Use' clearly denotes that continued use will act as a manifestation of intent to be bound. And, crucially, the 'Terms of Use' hyperlink is conspicuously distinguished from the surrounding text in bright blue font, making its presence readily apparent." (cleaned up)); *Moule v. United Parcel Serv. Co.*, Case No.: 1:16-cv-00102-JLT, 2016 WL 3648961, at *5 (E.D. Cal. July 7, 2016) ("[T]he UPS shipper was informed: 'By clicking the Yes button, you agree to the UPS Tariff/Terms and Conditions.' In addition, immediately below this statement, and above the 'Yes' button, a hyperlink to the 'Terms and Conditions' was provided. Because it is undisputed that Plaintiff had the opportunity to view the Terms and Conditions and clicked the 'Yes' button to process the shipment, the Court finds Plaintiff manifested assent to the UPS Terms when arranging the shipment at issue.").

---

"including the hyperlinks to the Terms and Conditions and Privacy policy, appear[ed] directly below the buttons for registration").

In addition, as noted *supra* n.5, SoLo's counsel admitted during oral argument that this case involves a unique fact pattern.

Last, the Court notes that it is wholly unpersuaded by SoLo's contention that each of Checchia's nineteen Loan Agreements incorporated by reference SoLo's Terms and that Checchia manifested his assent to the Terms by entering into those Agreements. (*See* Doc. No. 8 at 21 & n.34.) The sole case SoLo relies upon to support its position, *In re Estate of Atkinson*, 231 A.3d 891 (Pa. Super. Ct. 2020), is inapposite, as that case involved a very explicit incorporation by reference provision. *See id.* at 894–895 (explaining that the Trustee had to complete and sign an application to open a Brady CAP Account, which included an explicit provision, "I have reviewed and read the accompanying CAP ACCOUNT CUSTOMER AGREEMENT (the 'CAP Agreement'), including the documents incorporated by reference in the CAP Agreement and agree to be bound by the terms and conditions contained therein" and that immediately above the Trustee's signature, the Brady CAP account application stated in bold font and all capital letters "THE CAP AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE. BY SIGNING THIS APPLICATION, I ACKNOLWEDGE RECEIPT OF A COPY OF THE AGREEMENT CONTAINING SUCH CLAUSE"). In contrast, the Loan Agreements do not expressly incorporate by reference SoLo's Terms. Rather, they merely state in the Default provision, "Borrower may be deemed in default (each, an 'Event of Default') of Borrower's obligations under this Note if Borrower . . . (4) fails to abide by the terms of this Note or the SoLo Terms and Conditions." (*See, e.g.*, Doc. No. 8-2, Ex. A at 7 (February 28, 2022 Loan Agreement).) This is woefully insufficient.

\* \* \*

For these reasons, the Court finds that SoLo has failed to show that a valid arbitration agreement exists and denies SoLo's motion to compel arbitration.[7]

---

[7] Because SoLo has failed to show that a valid arbitration agreement exists, the Court does not address

**V.     Conclusion**

For the foregoing reasons, the Court denies SoLo's motion to compel arbitration.

An appropriate Order follows.

---

Checchia's remaining arguments as to the delegation clause and unconscionability.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **STEVEN CHECCHIA,** | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 23-cv-444-KSM** |
| **SOLO FUNDS, INC.,** | |
| Defendant. | |

## <u>ORDER</u>

**AND NOW**, this 7th day of June, 2023, upon consideration of Defendant's Motion to Compel Arbitration (Doc. No. 8), Plaintiff's opposition brief (Doc. No. 12), Defendant's reply (Doc. No. 13), and Plaintiff's sur-reply (Doc. No. 14), following oral argument, and for the reasons set forth in the accompanying Memorandum, it is **ORDERED** that the motion is **DENIED**.

**IT IS SO ORDERED.**

/s/ **Karen Spencer Marston**
_____
KAREN SPENCER MARSTON, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEVEN CHECCHIA, individually and as a
representative of the Class,,

        Plaintiff,

        v.

SOLO FUNDS, INC.,

        Defendant.

Case No.: 2:23-cv-00444

### DEFENDANT SOLO FUNDS, INC'S NOTICE OF APPEAL

Notice is hereby given that Defendant, SoLo Funds, Inc. ("SoLo"), in the above-captioned case, hereby appeals to the United States Court of Appeals for the Third Circuit from the Order dated and entered on June 7, 2023 [Dkt. 22] and the Memorandum Opinion dated and entered on June 7, 2023 [Dkt. 21] on all grounds. The Order denied SoLo's Motion to Compel Arbitration for the reasons stated in the Memorandum Opinion, and is appealable pursuant to 9 U.S.C. § 16(a)(1).

Dated:  July 5, 2023

Respectfully submitted,

*/s/ Andrew K. Stutzman*
Andrew K. Stutzman
Christopher A. Reese
STRADLEY RONON STEVENS & YOUNG, LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103-7098
T: (856) 321-2408 | F: (856) 321-2415
E: astutzman@stradley.com; creese@stradley.com

And

Joseph A. Apatov
McGLINCHEY STAFFORD
101 NE 3rd Avenue, Suite 1810
Fort Lauderdale, FL 33301
T: (954) 356-2516 | F: (954) 252-3808
E: japatov@mcglinchey.com
*Attorneys for Defendant, SoLo Funds, Inc.*

1

Error! Unknown document property name.

## CERTIFICATE OF SERVICE

I, Andrew K. Stutzman, Esquire, hereby certify that on this 5th day of July, 2023, I caused a true and correct copy of the foregoing to be filed via the Court's ECF system and to be served on Plaintiff by regular mail.

/s/ Andrew K. Stutzman
Andrew K. Stutzman

2